Filed 6/21/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.P., a Person Coming Under the Juvenile Court Law. | H038640 (Santa Clara County Super. Ct. No. JD18959) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY & CHILDREN'S SERVICES, Plaintiff and Respondent, v. A.P., Defendant and Appellant. | |

In this delinquency case (Welf. & Inst. Code, § 300),[1] A.P., mother of M.P., appeals from the August 7, 2012 order that followed a contested jurisdictional and dispositional hearing.[2] On appeal, she challenges only the court's appointment of a guardian ad litem (GAL) for her and its failure to hold a *Marsden*-type[3] hearing regarding replacement of her appointed counsel.

---

[1] All further references are to Welfare and Institutions Code unless otherwise specified.

[2] A previous dependency case was commenced on behalf of M.P. in May 2008. Dependency jurisdiction in that case was terminated in December 2010.

[3] *People v. Marsden* (1970) 2 Cal.3d 118.

1

We conclude that the record supports the trial court's appointment of a GAL for mother and its failure to conduct a full *Marsden*-type inquiry was not reversible error. Accordingly, we affirm.

I

*Procedural History*

On January 11, 2012, a juvenile dependency petition was filed on behalf of M.P., then 11 years of age, pursuant to section 300, subdivisions (b) (failure to protect) and (c) (serious emotional damage).

A first amended petition was filed on January 17, 2012. It alleged that M.P. came within the jurisdiction of the juvenile court under only subdivision (b) of section 300.

On January 18, 2012, counsel was appointed for mother. The court ordered M.P. temporarily removed from mother's physical custody and released M.P. to her father pending the jurisdiction hearing. Supervised visitation was ordered for mother.

On February 2, 2012, a second amended petition was filed. It alleged that M. P. came within the jurisdiction of the juvenile court under subdivisions (b) and (c) of section 300.

The second amended petition alleged the following facts. Mother "suffers from severe mental health problems which have resulted in [M.P.] suffering serious emotional harm." On about January 5, 2012, M.P. and her mother engaged in a physical altercation during which they were both bruised. On January 7, 2012, they both sought medical treatment; they told medical professionals that "they were being repeatedly raped by someone who was breaking into their home on a nightly basis."

The petition also alleged that M.P. was placed "on a 5150 hold due to her delusional thoughts and prior suicidal ideation." M.P. was under a psychiatric hold from January 7, 2012 to January 10, 2012 and the treating psychiatrist diagnosed her "as suffering from Psychosis NOS, folie á deux (shared psychotic disorder)." It was the

2

psychiatrist's opinion that " '[M.P.'s] mental status is being negatively affected by her mother's condition and her irrational beliefs' . . . . "  On January 12, 2012, M.P. was taken into protective custody pursuant to a warrant.

The petition additionally stated that, in 2008, Dr. Sheri Terao diagnosed mother with schizophrenia, paranoid type.  Mother has refused to participate in services to treat her mental illness and her "untreated mental health condition negatively impacts her ability to effectively parent [M.P.]."  For several years, mother has repeatedly made accusations that "she and [M.P.] have been raped on a daily basis by people who have broken into the home."  Despite the lack of evidence to support mother's claims, M.P. has "repeated the mother's accusations . . . ."

The petition further alleged that "[M.P] exhibits symptoms of emotional harm in that she has engaged in self-injurious behavior and suicidal ideation."  "[M.P.] and the mother have a conflictual relationship . . . characterized by mutual physical combat."

In addition, the petition alleged that six prior Child Protective Services referrals were substantiated.  Previously, on July 18, 2008, M.P. had been adjudged a dependent child of the juvenile court.  Mother had received services for her "auditory and visual delusions negatively impacting [M.P.'s] emotional well-being" and father had received services for "substance abuse and domestic violence."

At the March 26, 2012 trial setting hearing, the juvenile court stated for the record that mother's counsel had informed the court that it was necessary to hold a *Sara D.*[4] hearing (regarding appointment of a GAL) or a *Marsden* hearing or both.  The court stated that it had determined that the *Sara D.* hearing should be first "to make sure that the mother is competent to even question the competence of her attorney."  The matter was continued until April 3, 2012.

---

[4]     *In re Sara D.* (2001) 87 Cal.App.4th 661.

On April 3, 2012, mother's counsel informed the court: "At this point in the procedure the mother . . . and I have run into a conflict, and our understanding of one another. And I do believe that she would benefit from the assistance of a guardian ad litem in terms of making legal decisions and legal strategy. I understand from communications between [mother] and myself as well as [mother] and my employer, that she does not want a guardian ad litem and wants another attorney appointed to represent her. So she'd like to be heard on that."

The court reiterated that the *Sara D.* hearing would be conducted first. It stated: "I need to make a determination of your client's competency which has [a] bearing on the second question of whether or not you should continue with your representation."

Following a separate, closed hearing with mother and her counsel regarding whether to appoint a GAL, the court determined that mother required a GAL and appointed a GAL. It did not hold a *Marsden*-type hearing.

The Department filed a Jurisdiction/Disposition Report, dated February 10, 2012, which reported that M.P. was currently residing with father. It recommended that the court sustain the second amended petition and place M.P. with father under the Department's supervision with family maintenance services and order no services for mother "because the provision of such services is not in the best interests of the child."

Dr. Sheri Terao's October 2008 report concerning the court-ordered psychological evaluation of mother was filed with the Jurisdiction/Disposition Report. The report indicated that mother's "social and emotional functioning" was "primarily afflicted by the presence of prominent delusions." Dr. Terao had diagnosed mother with Schizophrenia, Paranoid Type. The report stated: "For many years, [mother] has developed a belief system that her husband and another woman are stalking her and have brought harm (both physical and emotional) to her and her daughter. [Mother's] delusions have a bizarre quality to them as many of her beliefs may be regarded as totally implausible." It

4

disclosed that mother is "firmly entrenched in her delusional belief system" and "lacks insight into her mental health condition . . . ."

A number of addendums to the Jurisdiction/Dispostion Report were filed. The fourth addendum report, dated July 17, 2012, recommended that the juvenile court sustain the second amended petition, find M.P. came within the descriptions of section 300, subdivisions (b) and (c), issue family court orders giving father sole legal and physical custody of M.P. and allowing mother to have supervised visits with M.P., and dismiss the dependency petition.

On July 16, 2012 and July 17, 2012, the court held a contested jurisdiction/disposition hearing. On July 17, 2012, the court set the matter for decision on August 7, 2012.

On August 7, 2012, the juvenile court found that the allegations of the second amended petition, filed February 2, 2012, as amended to omit allegations concerning father, were true. The court determined that M.P. was described by section 300, subdivisions (b) and (c). It adjudged M.P. to be a dependent child of the court. It awarded legal and physical custody of the child to the father, the prior noncustodial parent. The court then terminated its jurisdiction over the family and dismissed the dependency.

II

*Discussion*

A. *Guardian ad Litem*

1. *Hearing*

At the April 3, 2012 hearing regarding appointment of a GAL, the court explained a GAL's role and the standards for appointment. It told mother that her counsel believed that she was not able to assist him in the preparation of the case and she did not really

5

understand the nature of the proceedings. Mother's counsel proceeded to explain his concerns.

Counsel indicated that he had met with mother on more than one occasion. He pointed out that a number of the petition's allegations concerned mother's mental health. Counsel indicated that the dispositional recommendations were that the child should be placed with father and any visitation should be supervised and conditioned upon mother's regular participation in psychiatric treatment and compliance with medication. Mother had disagreed with the allegations and claimed she did not need medication. Counsel believed that mother would not be "able to competently proceed through these very complex jurisdictional and dispositional issues" unless she was taking medication and addressing the mental health concerns.

Mother complained to the juvenile court that she had never seen her counsel in his office except on February 22, 2012. She stated that he had sent her an e-mail through his cell phone and told her it was better to send him an e-mail. The court indicated that the focus at the moment was her mental health. Mother stated that she did not believe that she was delusional and she did not believe the petition.

Mother's counsel referred to the 2008 psychological assessment of mother conducted by Dr. Terao. He stated that "Dr. Terao was very clear . . . that [mother] has serious mental health needs [and] without medication . . . she is not able to . . . understand the difference between facts as the majority of people are experiencing [them] and the way that [she] is experiencing the world around her." He indicated that it was "impossible to have a competent intelligible kind of a legal conversation." Counsel believed mother had her daughter's best interest at heart but he could not continue to work with mother without a third party who could work with mother and understand what he "need[ed] to do to move forward with this case."

6

Mother stated that her therapist believed that she was not delusional and Dr. Terao's diagnosis was invalid. Mother mentioned that counsel had previously not responded to her email about an upcoming hearing, she had sent a second email, and then counsel had answered. Mother was unhappy because she felt that her attorney did not understand her email request for extra visits to make up for visits missed due to health problems and he did not speak up for her on this matter on March 12, 2012.[5] Mother complained: "[My counsel] claims that I'm disabled mentally. So I'm supervised with my child if he thinks that I'm dangerous. And it's a supervise [sic] visitation and makeup visitation very reasonable to lift up a sick mother. I wasn't feeling well, your Honor, and I had broken foot. [¶] So I wasn't getting any help from [my counsel] that I was thinking that is not good for our relationship, your Honor. . . ."

The juvenile court brought up mother's allegations over many years that she and her daughter had been "raped on a daily basis" by people who had broken into mother's home. The court asked mother, "Do you believe people have broken into your home?" Mother initially responded: "Your Honor, when my windows—I wasn't—my landlord is upset because the window cracked and the latch to the other one. And there's now, my landlord is upset with me. He says is it wasn't like that, my house and I have the e-mail too. So I didn't do that. I didn't see anybody in my house, your Honor." In the face of meandering, nonresponsive and sometimes unintelligible replies, the court persisted in its questioning.

When the court again asked mother if she believed there are people breaking into her home, mother answered, "I have a suspicion, yes." The court asked whether those people were drugging her and mother responded that she did not see it. The court pressed, "Do you believe that people have been drugging you?" Mother answered, "Well,

---

[5] The March 12, 2012 minute order reflects that mother's counsel requested a continuance of trial setting for the jurisdiction hearing, which the court granted.

my doctor, yes, he said that."  The court asked, "Your family doctor said someone has been drugging you?"  Mother replied, "He didn't layout like that, but he talked in a different way.  In a different many—many years and he also gave some many years to the court.  We have these in the records, his letters."

Mother admitted that, although she had not seen it, she did believe that people had been breaking into each of her homes over the years and explained, "I have many items that are broken in my house and [I have] lost property . . . ."  When the court asked if the police had ever arrested anybody for breaking into her home, mother answered, "I have never seen, but I see the doors are cracked.  My properties are ruined.  And I have properties are important, your Honor.  I have lost them.  I don't have them right now many of them."

Even though mother had not seen it and she could not be absolutely sure, mother believed that her current neighbor had broken into her house and drugged her multiple times.  Mother had reported the neighbor, who had been interviewed by police.

After mother indicated that she was honest, the court asked, "What is it that you have been reporting that people don't believe?"  Mother replied: "This breaking and entering in such my car has been vandalized even in felony level over $5,000 damage in my car.  And I have the paperwork through the insurance.  I also had a hate crime in the internet that's a valid hate crime in the internet."  The court inquired, "What happened?"  Mother said, "Somebody was threatening to kill me clearly.  And I print that out and forwarded it to the officers.  I have a valid report."  The court said, "Okay."  Mother then stated, "So this thing that I was thinking of my car is being in and inside the engine.  And the –the inside of the car engine and outside also was damaged, and it's continued wherever I moved.  I have the reports, your Honor.  These things regarding what I'm talking."

8

At one point, mother indicated that she was still waking up with pain in her vagina. Mother later admitted reporting that people had broken into her home and raped her and her daughter. She indicated that she believed it happened at night when she went to sleep.

Mother said that she had woken up with her ribs hurting one day and had gone to a hospital's emergency room. When later asked whether she believed someone broke in at night and raped her and her daughter during December, mother indicated that her chest and ribs were hurting and a "burning sensation was coming over even [her] mouth . . . ." When the doctors asked her if she had an injury, she said no. When the juvenile court asked whether she believed somebody came in at night and raped her, mother replied, "No, my chest was hurting, somebody hit me."

Mother indicated that her counsel had sent her an email asking her to agree to a GAL and she felt that counsel had "already made up his mind" even before he ordered an independent evaluation of her. Mother said that her therapist did not agree with her counsel. When the court asked if she agreed with the report's assessment, mother replied, "The assessor has told me that it was in his report, you know, I'm not agreeing in short time. He's not sure either. And if I am reading it in the medication or not that's my understanding out of I'm reading and he—because he said it's a short time."

Mother indicated that she was able to make her own decisions and her attorney and she were "thinking different." She stated, "Request another different attorney so I that can talk to communicate better."

The juvenile court concluded that a GAL was necessary for mother, stating "I don't believe that we are going to . . . be able to make any progress in this case given [mother's] sort of single-minded clutching to this belief of what has happened to her repeatedly and over the course of years when there's no evidence of that happening."

9

The court did not hold a *Marsden* hearing. The court explained that the court did not believe that mother was competent to decide whether she needed a substitute attorney based on its "assessment of [her] mental health throughout our conversation and [her] ability to be in touch with reality" with regard to the specific allegations before the court.

2. *Governing Law*

"In a dependency case, a parent who is mentally incompetent must appear through a guardian ad litem, to whom the parent yields management and control of the litigation. (*In re Daniel S.* (2004) 115 Cal.App.4th 903, 912. . . ; *In re Sara D.* (2001) 87 Cal.App.4th 661, 665-667 . . . .) Before appointing a guardian ad litem for a parent in a dependency proceeding, however, the juvenile court must hold an informal hearing at which the purpose and powers of a guardian ad litem and the reasons for believing the parent incompetent are explained to the parent and, if the parent does not consent to the guardian ad litem's appointment, the parent is given an opportunity to argue that a guardian ad litem is not required. (*In re Sara D.*, *supra*, at pp. 663, 671-672 . . . .)" (*In re James F.* (2008) 42 Cal.4th 901, 904.)

"The test [of mental competence] is whether the parent has the capacity to understand the nature or consequences of the proceeding *and* to assist counsel in preparing the case. [Citations.]" (*In re James F., supra,* 42 Cal.4th at p. 910, italics added.) A person may be found incompetent if the person was either incapable of understanding the nature and purpose of the proceeding *or* unable to assist counsel in a rational manner. (See *People v. Huggins* (2006) 38 Cal.4th 175, 191-192.) "As another court has stated: ' "If the accused is so delusional or paranoid that he will not trust his counsel or tell him the true facts, then he would be incompetent." ' (*People v. Valentino* (N.Y.Sup.Ct.1974) 78 Misc.2d 678, 356 N.Y.S.2d 962, 968; see also ABA Standards for Criminal Justice (2d ed. 1980) Mental Health Standards, std. 7–4.1, commentary, p. 7–174 [stating that competency to stand trial should include a determination that a

10

defendant possesses 'the capacity to maintain the attorney-client relationship, embracing an ability to discuss the facts of a case with counsel "without paranoid distrust" '].)" (*People v. Welch* (1999) 20 Cal.4th 701, 779.)

"The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem, who may waive the parent's right to a contested hearing. [Citations.]" (*In re James F.*, *supra*, 42 Cal.4th at p. 910.) "If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence. [Citation.]" (*Id.* at p. 911.)

"[T]he primary concern in section 300 cases is whether the parent understands the proceedings and can assist the attorney in protecting the parent's interests in the companionship, custody, control and maintenance of the child." (*In re Sara D., supra,* (2001) 87 Cal.App.4th at p. 667, fn. omitted.) "In a dependency proceeding, a juvenile court should appoint a guardian ad litem for a parent if the requirements of either Probate Code section 1801 or Penal Code section 1367 are satisfied. (*In re Sara D.*, *supra*, 87 Cal.App.4th at p. 667 . . . .)"[6] (*In re James F.*, *supra*, 42 Cal.4th at p. 916.) "[T]he trial court must find by a preponderance of the evidence that the parent comes within the requirements of either section." (*In re Sara D.*, *supra*, 87 Cal.App.4th at p. 667, fn. omitted.)

---

[6] Penal Code section 1367, subdivision (a), provides in pertinent part: "A defendant is mentally incompetent . . . if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the . . . proceedings or to assist counsel in the conduct of a defense in a rational manner." Under Probate Code section 1801, a conservator may be "appointed for a person who is unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter" or "who is substantially unable to manage his or her own financial resources or resist fraud or undue influence . . . ." (Prob. Code, § 1801, subds. (a) & (b).)

11

3. *Sufficiency of the Evidence to Show Incompetence as Legally Defined*

At the hearing on whether to appoint a GAL, mother's competency only under Penal Code section 1367 was at issue. Mother asserts there was not substantial evidence that she was incompetent and the error in appointing a GAL was not harmless. Mother does not assert that she was deprived of procedural due process with respect to the appointment.

Mother insists that the "court's conversation [with her] about whether or not she believed someone was breaking into her house was not indicative that she did not understand the nature of the proceedings or would be unable to assist her attorney." She argues that the juvenile court "mistook that preliminary finding of mental illness as necessitating a guardian ad litem." She suggests that the Department finds her "answers unintelligible because Turkish is [her] native language and her English sentence structure is often imperfect."

Regardless of the language difficulties, mother's unsupported statements regarding people repeatedly entering her residences or car and doing injury to her and her daughter indicated that she was still suffering from a mental disorder involving delusions and paranoid beliefs. As stated in the commentary to Standard 7-4.1 of the American Bar Association Criminal Justice Mental Health Standards, an attorney-client relationship requires the defendant to have "an ability to discuss the facts of a case with counsel 'without paranoid distrust,' " a capacity "to advise and accept advice from counsel" and "an ability to consult rationally about a pending case which is something more than a superficial capacity to converse with others." (ABA Crim. Justice Mental Health Stds. (1989 ed.) com. to std.7-4.1, p. 174, fns. omitted.)

Based upon its exchange with mother and her counsel at the closed hearing, the juvenile court could reasonably infer from mother's remarks that she could not rationally

12

confer with her counsel about the facts or rationally assist him with the case and she could not rationally give and take advice regarding legal strategy. Mother's responses indicated that she was still delusional and did not appreciate her own mental health problems that had led to the commencement of the dependency proceeding. Substantial evidence shows that mother was incompetent as legally defined for purposes of appointing a GAL and she needed a GAL to protect her interests.

B. *Request to Substitute Counsel*

Mother asserts that the court erred in failing to hold a *Marsden*-type hearing and, therefore, this court should remand the matter for a hearing to determine whether the juvenile court should have appointed new counsel to replace mother's appointed counsel.

1. *Governing Law*

"Because a basic civil right of the parent is thus at stake (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 . . .), significant due process safeguards have been built into the dependency scheme (*id.* at p. 307. . .), including a right to court-appointed counsel for a parent who cannot afford to retain counsel (Welf. & Inst. Code, § 317)." (*In re James F.*, *supra*, 42 Cal.4th at p. 904.) "All parties who are represented by counsel at dependency proceedings shall be entitled to competent counsel."[7] (§ 317.5, subd. (a); see Cal.Rules of Court, rule 5.660(d).)

---

[7]     California Rules of Court, rule 5.660(a), requires the superior court of each county to amend its local rules regarding the representation of parties in dependency proceedings to address, among other things, the "[p]rocedures for reviewing and resolving complaints by parties regarding the performance of attorneys." (Cal. Rules of Court, rule 5.660(a)(2)(F).) The rule states: "The [superior] court must establish a process for the review and resolution of complaints or questions by a party regarding the performance of an appointed attorney. Each party must be informed of the procedure for lodging the complaint. If it is determined that an appointed attorney has acted improperly or contrary to the rules or policies of the court, the court must take appropriate action." (Cal. Rules of Court, rule 5.660(e).) The Santa Clara County Superior Court has adopted a rule applicable to dependency proceedings that states: "Any party to a juvenile proceeding may lodge a written complaint with the Court concerning the performance of his/her

"Juvenile courts, relying on the *Marsden* model, have permitted the parents, who have a statutory and a due process right to competent counsel, to air their complaints about appointed counsel and request new counsel be appointed. (§ 317.5; *In re James S.* (1991) 227 Cal.App.3d 930, 935, fn. 13 . . . .)" (*In re V.V.* (2010) 188 Cal.App.4th 392, 398; see *In re Z.N.* (2009) 181 Cal.App.4th 282, 289 [*Marsden* principles apply by analogy to dependency proceedings].)

In *Marsden*, the California Supreme Court stated: "A trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys unless he is cognizant of the grounds which prompted the request. The defendant may have knowledge of conduct and events relevant to the diligence and competence of his attorney which are not apparent to the trial judge from observations within the four corners of the courtroom. . . . Thus, a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney. A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination.' [Citation.]" (*Marsden*, *supra*, 2 Cal.3d at p. 123.) It concluded: "Because the defendant might have catalogued acts and events beyond the observations of the trial judge to establish the incompetence of his counsel,

---

appointed attorney in a Juvenile Court proceeding as follows: [¶] i. Complaints or questions shall initially be referred to that attorney's supervisor within the agency, association or law firm appointed to represent the client. [¶] ii. If the issue remains unresolved or if there is no designated agency, association or law firm, the party may submit a written complaint to the Court in which the matter is pending. The Court shall within ten (10) days conduct its own review of the complaint or question. That review may include a hearing in chambers. The Court may take any appropriate action required, including relieving counsel and appointing new counsel and/or holding a formal hearing on the matter." (Super. Ct. Santa Clara County, Local Rules, Juv. Rule 2(D)(2)(a).)

the trial judge's denial of the motion without giving defendant an opportunity to do so denied him a fair trial.  We cannot conclude beyond a reasonable doubt that this denial of the effective assistance of counsel did not contribute to the defendant's conviction. (*Chapman v. California* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.)"  (*Id*. at p. 126.)

Thus, "[w]hen a [criminal] defendant seeks new counsel on the basis that his appointed counsel is providing inadequate representation . . . the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance."  (*People v. Smith* (2003) 30 Cal.4th 581, 604.)  "[A]t any time during criminal proceedings, if a defendant requests substitute counsel, the trial court is obligated, pursuant to [the] holding in *Marsden,* to give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney.  (*Marsden, supra,* 2 Cal.3d at p. 126. . . .)"  (*People v. Sanchez* (2011) 53 Cal.4th 80, 90, fn. omitted.)  A *Marsden* "inquiry is forward-looking in the sense that counsel would be substituted in order to provide effective assistance in the *future*."  (*People v. Smith* (1993) 6 Cal.4th 684, 695.)

Even where a trial court has suspended criminal proceedings pending a hearing on defendant's competency to stand trial (see Pen. Code, § 1368), a trial court "may and indeed *must* promptly consider a motion for substitution of counsel when the right to effective assistance 'would be substantially impaired' if his request were ignored. [Citation.]"  (*People v. Stankewitz* (1990) 51 Cal.3d 72, 88.)  In *People v. Solorzano* (2005) 126 Cal.App.4th 1063, a trial court refused to immediately hold a *Marsden* hearing when defendant complained about his counsel and indicated that he wanted to "fire" him during a hearing concerning defendant's competency.  (*Id*. at pp. 1066-1067.)  On appeal, the reviewing court concluded that the defendant's request triggered the court's duty to hold a *Marsden* hearing before deciding defendant's competency to stand

15

trial. (*Id*. at p. 1070.) It reversed the judgment since it could not find beyond a reasonable doubt that the failure to make an immediate *Marsden* inquiry had not contributed to the court's determination that defendant was competent to stand trial. (*Id*. at p. 1071.)

In *People v. Taylor* (2010) 48 Cal.4th 574, the California Supreme Court distinguished *Solorzano* from case before it. The court stated: "This is not a case like *People v. Solorzano* (2005) 126 Cal.App.4th 1063 . . . , in which the trial court refused to hold any *Marsden* hearing until *after* the results of a competency hearing. In *Solorzano,* the defendant's complaints about his counsel pertained to counsel's deficiencies in handling the competency hearing, at which, over defendant's objection, he was adjudged competent. On these facts, the Court of Appeal concluded it could not find beyond a reasonable doubt that the error had not affected the competency hearing's outcome. (*Id*. at pp. 1069-1071 . . . .)" (*Id*. at p. 601.)

The *Marsden* decision was "intended to afford protection to the [criminal] defendant's right to counsel as guaranteed by the Sixth Amendment . . . ." (*People v. Martinez* (2009) 47 Cal.4th 399, 419; see *Gideon v. Wainwright* (1963) 372 U.S. 335, 344-345 [83 S.Ct. 792] [Sixth Amendment right to counsel applies to the states through the Fourteenth Amendment].) "[T]he Sixth Amendment does not govern civil cases." (*Turner v. Rogers* (2011) ___ US. ___, ___ [131 S.Ct. 2507, 2516].)

2. *Failure to Hold a Separate Marsden-type Hearing*

We assume for purposes of this appeal that mother had a federal due process right to effective assistance of counsel (but see *Lassiter v. Department of Social Servs. of Durham Cty.* (1981) 452 U.S. 18 [101 S.Ct. 2153])[8] as evaluated under *Strickland*

---

[8] In *Lassiter v. Department of Social Servs. of Durham Cty.* (1981) 452 U.S. 18 [101 S.Ct. 2153] ("*Lassiter*"), the issue was whether "the Due Process Clause requires the appointment of counsel [for a parent] when a State seeks to terminate an indigent's parental status." (*Id*. at p. 31.) The U.S. Supreme Court recognized that the Fourteenth

16

standards[9] (see e.g. *In re Jackson W.* (2010) 184 Cal.App.4th 247, 261; *In re O.S.* (2002) 102 Cal.App.4th 1402, 1407). In this case, however, mother has neither raised an ineffective assistance claim nor claimed she received deficient representation. Further, the mere failure to conduct a separate *Marsden*-type hearing does not demonstrate a constitutional deprivation of effective assistance of counsel under *Strickland*.

*Strickland v. Washington*, *supra*, 466 U.S. 668, which the U.S. Supreme Court handed down *after* California's *Marsden* decision, established that a claim of ineffective assistance of counsel requires a showing of both deficient performance *and* prejudice. [10]

---

Amendment to the U.S. Constitution "imposes on the States the standards necessary to ensure that judicial proceedings are fundamentally fair." (*Id*. at p. 33.) The court was also mindful, however, that "child-custody litigation must be concluded as rapidly as is consistent with fairness . . . ." (*Id*. at p. 32.) It concluded that the federal Constitution does not compel the appointment of counsel for parents in every parental termination proceeding. (*Id*. at p. 31.) The court determined that the question whether due process requires appointment of counsel for indigent parents in termination proceedings must be decided on a case-by-case basis. (*Id.* at pp. 26, 31-32.) The Supreme Court indicated in *Lassiter* that a trial court is responsible for the initial decision, "subject, of course, to appellate review. [Citation.]" (*Id*. at p. 32.)

[9] *Strickland v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052].

[10] To demonstrate ineffective assistance, a criminal defendant "must show that counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 688.) As to the prejudice prong, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.) "In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome . . . . [Citations.]" (*Harrington v. Richter* (2011) ___ U.S. ___, ___ [131 S.Ct. 770, 791-792].) "The likelihood of a different result must be substantial, not just conceivable. [Citation.]" (*Id*. at p. 792.) "The requirement that a defendant show prejudice . . . arises from the very nature of the specific element of the right to counsel at issue there— *effective* (not mistake-free) representation. Counsel cannot be 'ineffective' unless his mistakes have harmed the defense (or, at least, unless it is reasonably likely that they have). Thus, a violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced. See *Strickland, supra,* at 685, 104 S.Ct. 2052." (*U.S. v. Gonzalez-Lopez* (2006) 548 U.S. 140, 147.)

(*Id*. at p. 687; see *Mickens v. Taylor* (2002) 535 U.S. 162, 166 [122 S.Ct. 1237] ["As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Id*., at 694, 104 S.Ct. 2052."].)

Here, the sole question is whether the juvenile court's failure to conduct a separate *Marsden*-type inquiry in this case was error and requires a remand. Although mother clearly indicated that she wanted a substitute attorney, we think it is inappropriate to rigidly and unthinkingly apply *Marsden* and its progeny to dependency proceedings.

Under the circumstances of this case, the juvenile court had a good idea of the reasons for mother's dissatisfaction with counsel. Mother had mentioned her counsel's failure to meet with her in his office more than once, his failure to respond to an email, his failure to request "makeup visits" at a hearing scheduled for trial setting, and his belief that she had a mental disability. Mother was unhappy that her counsel had asked for her agreement to appointment of a GAL and she felt that counsel had prejudged her. She indicated that they thought differently and she wished to have another attorney with whom she could communicate better.

"A defendant may not effectively veto an appointment of counsel by claiming a lack of trust in, or inability to get along with, the appointed attorney. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070 . . . .) Moreover, the trial court need not conclude that an *irreconcilable* conflict exists if the defendant has not tried to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1086 . . . .)" (*People v. Smith*, *supra*, 30 Cal.4th at p. 606.) " '[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict.' (*People v. Smith* (1993) 6 Cal.4th 684, 696.)" (*Ibid*.) "[T]actical disagreements between a defendant and his attorney or a defendant's frustration with counsel are not sufficient cause for substitution

18

of counsel. (*People v. Jackson* (2009) 45 Cal.4th 662, 688 . . . ; *People v. Barnett* (1998) 17 Cal.4th 1044, 1092 . . . .)" (*People v. Streeter* (2012) 54 Cal.4th 205, 231.) In addition, "the number of times one sees [her] attorney, and the way in which one relates with [her] attorney, does not sufficiently establish incompetence." (*People v. Silva* (1988) 45 Cal.3d 604, 622.)

None of mother's complaints indicated that her counsel was not providing adequate representation or that counsel and she were embroiled in such an irreconcilable conflict that ineffective representation would likely result. In the criminal context, where a court holds a *Marsden* hearing, it "does not abuse its discretion in denying the motion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel. [Citation.]" (*People v. Smith*, *supra*, 30 Cal.4th at p. 604.)

Here, the juvenile court could reasonably conclude that appointment of a GAL would address mother's complaints. Even though the court did not hold a separate *Marsden*-type hearing, reversal under the circumstances of this case would unnecessarily undermine "the strong public interest in prompt resolution of [dependency] cases so that the children may receive loving and secure home environments as soon as reasonably possible. [Citations.]" (*In re James F.*, *supra*, 42 Cal.4th at p. 918.)

Different interests are at stake in criminal prosecutions and dependency proceedings. "The rights and protections afforded parents in a dependency proceeding are not the same as those afforded to the accused in a criminal proceeding. For example, a juvenile court may rely on hearsay contained in a social worker's report to support a jurisdictional finding in a dependency case, although such evidence could not be used to establish guilt in a criminal proceeding. (See *In re Malinda S.* (1990) 51 Cal.3d 368, 373 . . . .) Also, unlike a defendant in a criminal proceeding, '[a] parent at a dependency hearing cannot assert the Fourth Amendment exclusionary rule, since "the potential harm

19

to children in allowing them to remain in an unhealthy environment outweighs any deterrent effect which would result from suppressing evidence" unlawfully seized.' (*In re Mary S.* (1986) 186 Cal.App.3d 414, 418 . . . .)" (*In re James F.*, *supra*, 42 Cal.4th at p. 915.)

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)." (*Medina v. California* (1992) 505 U.S. 437, 439 [112 S.Ct. 2572].)  Unlike criminal prosecutions, dependency proceedings go forward even if a parent is legally incompetent.  In fact, as in this case, it may be the parent's underlying mental health problems that create the need for exercising dependency jurisdiction in the first place.

"Dependency proceedings are not designed to prosecute parents.  [Citations.]  In a dependency proceeding, the state is empowered to intervene because a parent's inadequacy puts a child at risk." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1238.)  The state has a legitimate interest in dependency proceedings "in providing an expedited proceeding to resolve the child's status without further delay." (*In re Malinda S.* (1990) 51 Cal.3d 368, 384.)

In this case, we think the court had sufficient information to reasonably believe that any communication problems between attorney and client would be resolved by the appointment of a GAL and counsel was providing effective assistance.  We believe the juvenile court soundly exercised its discretion in appointing a GAL for mother and then concluding that a separate *Marden*-type inquiry was no longer necessary.

Mother has not provided any authority establishing, and has not asserted, that a federal constitutional procedural due process violation occurs when a juvenile court fails to hold a separate *Marsden*-type hearing in the present situation.  Although we assume

20

that mother had a due process right to counsel, it does not appear that the "dictates of due process" also demanded a *Marden*-type inquiry in order to ensure the fundamental fairness of this dependency proceeding. (See *Mathews v. Eldridge* (1976) 424 U.S. 319, 334-335 [96 S.Ct. 893]; see also *Lassiter*, *supra*, 452 U.S. at pp. 27-31.)

Even if the juvenile court was required to conduct a *Marsden*-type hearing as a matter of state law, the procedural error did not result in a miscarriage of justice. (See Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836; cf. *In re Celine R.* (2003) 31 Cal.4th 45, 59-60 [failure to appoint separate attorneys for children]; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1667-1668 [violation of parent's statutory right to effective assistance of counsel].) It is not reasonably probable that a result more favorable to mother would have been reached had the juvenile court conducted a separate *Marsden*-type hearing in this case.

The record strongly suggests that the mother's complaints about counsel were related to her serious mental health issues and appointment of a GAL would remedy the situation. Impliedly it did, since the record does not show that mother's GAL requested substitution of counsel or filed a written complaint about him (see Cal. Rules of Court, rule 5.660(e); Super. Ct. Santa Clara County, Local Rules, Juv. Rule 2(D)(2)(a)). In the absence of evidence to the contrary, we presume that mother's GAL acted zealously to preserve mother's interests. (See *In re James F.*, *supra*, 42 Cal.4th at p. 918; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) As indicated, on appeal, mother has not asserted an ineffective assistance claim or challenged the court's August 7, 2012 findings or order. Under these circumstances, we find no basis for remanding the matter for a *Marsden*-type hearing.

DISPOSITION

The August 7, 2012 order is affirmed.

21

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.


*In re M. P., a minor*

H038640

22

Trial Court:                      Santa Clara County Superior Court

Trial Judge:                    Hon. Shawna Schwarz

Attorney for Appellant:      Carol A. Koenig,
Under Appointment by the
Court of Appeal

Attorneys for Respondent:   Lori E. Pegg,
Acting County Counsel and
Julie F. McKellar,
Deputy County Counsel

*In re M. P., a minor*

H038640