Filed 7/27/22  In re L.A. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re L.A., A Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>C.C.,<br><br>          Defendant and Appellant. | A163685<br><br>(San Francisco City & County Super. Ct. No. JD20-3273) |

In this dependency proceeding, C.C. (mother) appeals from the juvenile court's denial of a *Marsden*[1] motion and its refusal to allow her to represent herself.  Specifically, mother argues that the juvenile court abused its discretion in denying her *Marsden* motion because a complete breakdown in communication between mother and her appointed counsel prevented an adequate defense.  Mother also claims that remand is necessary because the court failed to rule on her request to represent herself and the record makes clear that a denial of her request would have been an abuse of discretion.  Seeing no reversible error, we affirm.

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

1

# I. BACKGROUND

## A. *Proceedings Through Disposition*

In October 2020, the San Francisco Human Services Agency (Agency) received a report that both mother and baby L.A. had tested positive for methamphetamine. L.A. was born prematurely at 35 weeks and was in the neonatal intensive care unit (NICU) suffering from low birth weight, low blood sugar, and feeding issues which required ongoing medical care and observation. Both mother and T.A. (father) denied mother used drugs. According to mother, she stopped using in February when she learned she was pregnant. Mother would not allow the social worker to disclose the positive drug tests to the maternal grandmother, so the Agency was unable to explore safety planning with the family. Mother theorized that someone might have slipped some methamphetamine into her water.

Mother's older child, N.B., had been placed in a guardianship in January 2019 after mother failed to reunify with her. According to the court report in N.B.'s dependency, mother had a long history of polysubstance abuse, mental health issues, and problems with domestic violence. Her case plan included participation in a substance abuse assessment, drug testing, individual therapy, a psychological evaluation, and visitation. However, although mother regularly and appropriately visited N.B., she never completed her substance abuse assessment and failed to participate in the other elements of her case plan. Mother later told L.A.'s social worker that she had done "everything" that the Agency asked of her during N.B.'s dependency, but her daughter ended up in guardianship because she was not properly represented in court.

On November 5, 2020, the Agency filed a dependency petition with respect to L.A., alleging that the minor came within the provisions of

2

Welfare and Institutions Code[2] section 300, subdivisions (b) and (j) due to mother's issues with substance abuse, domestic violence, and mental health as well as her failure to reunify with N.B. In addition, it was alleged that father minimized mother's substance abuse problems and had his own substance abuse issues which required assessment. L.A. was formally detained at the detention hearing on November 6, 2020.

Although the Agency could have recommended bypassing reunification services for mother pursuant to section 361.5, subdivision (10), based on her failure to reunify with N.B., it recommended services for both parents because mother was no longer homeless, had a support system, and stated she was in a "different place" than she was during the prior dependency. A contested jurisdictional and dispositional hearing was held on January 4, 2021. At the conclusion of the hearing, the court found the allegations in a first amended petition true and found L.A. to be a person described by subdivisions (b) and (j) of section 300. The court declared L.A. a juvenile court dependent, removed her from parental custody, and ordered reunification services for both parents. No appeal was taken from this order.

## B.    *Post-Dispositional and* Marsden *Matters*

In March 2021, the Agency filed a petition pursuant to section 388 seeking modification of the dispositional orders to require mother to engage in outpatient drug treatment and follow all recommendations. Mother completed a substance abuse assessment, but the assessor did not have " 'enough data' " to refer mother to treatment. Mother had not completed all of her scheduled drug tests and tested positive for alcohol in January 2021. In addition, in December 2020, the Ukiah police were called to a hotel due to

---

[2] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

3

a possible domestic disturbance.[3]  When the police entered the parents' room, they found methamphetamine on father and drug paraphernalia in the room. Father told the police officer that he " 'smoked crystal.' "  The court granted the petition on April 8, 2021.

The Agency filed a report in advance of the June 2021 six-month review.  The Agency had suspended in-person visitation when it learned of the December 2020 police interaction until the parents met with the social worker.  Since the parents failed to meet with the social worker until February 2021 and then refused to sign the Agency's COVID-19 waiver, the parents missed visitation for 10 of the first 20 weeks of L.A.'s life.  The social worker had been unable to meet with the parents during the reporting period.  The Agency had been arranging a hotel to facilitate visitation with L.A., but the parents had been "kicked out" of three separate hotels.  Mother was engaged in individual therapy but had not completed a drug test between February 26 and April 6, 2021.  The Agency was recommending termination of services and referral to a permanency planning hearing so that a permanent out-of-home placement could be established for L.A.  The six-month review recommendations were contested, and the matter was continued to September 10, 2021.

On September 10, 2021, the court granted a motion to continue the contested six-month review hearing to October 29, 2021.  In addition, attorney Peter Furst appeared on behalf of mother's counsel, Ms. Pendergast, and requested that a *Marsden* hearing be set, given that mother had "repeatedly sent a barrage of e-mails" to Ms. Pendergast telling her that she was "fired" and seemed to believe that Ms. Pendergast was "not doing her

---

[3] Reportedly, a hotel employee heard a male say:  " '[Y]ou will get in that tent[,] or I will kill you.' "

4

job." Counsel for father asked that a *Marsden* hearing also be scheduled for father. The court scheduled both hearings for September 17, 2021. Later that day, mother appeared before the court, confirming that she was asking the court "to change her lawyer." The court advised mother that it had set a hearing on September 17 for her to talk to the judge about her request to change lawyers. However, Mr. Furst advised the court that mother sent an email to him stating that "only people who are incompetent are assigned counsel, and she doesn't feel that she is incompetent, and therefore, that is why she doesn't want an attorney."

At the closed hearing on September 17, the juvenile court began by addressing mother that the hearing was a *Marsden* motion, and that "[y]ou are asking for the court to replace Ms. Pendergast. Can you give me your reasons why?" Mother began by stating: "So can I please say that I actually —it is a contract that I have. It is a legal binding contract with CPS. They have been served an affidavit. That has been served to them, and pretty much I can't answer any more questions or speak about anything else because there is a contract outside of the court." The juvenile court asked her if she wanted to replace her attorney, and she responded that she wanted to replace her attorney by being "sui juris" but not pro per. When the court expressed confusion, mother explained: "It means that, you know, like, there is an attorney—attorneys cannot represent a man or a woman. They can only represent a child or somebody that is incompetent or a corporation or an entity. I am not a corporation or an entity, and I don't agree to your guy's contract. [¶] And I am not—and I don't understand the contract.

Mother reiterated that she did not want a new attorney, she wanted to be sui juris. When the court stated it didn't know what she meant, mother suggested "maybe you should look it up or something." After more

5

unsuccessful attempts at clarification, Ms. Pendergast stated that, since sui juris is Latin for " 'in one's own right,' " she suspected mother wanted to represent herself. Mother replied: "Yes, but I don't want to be represented as a corporation or an entity or as a persona. I want to be representing as an individual, as a woman, as a woman that I am." The court responded: "[W]hat seems to be the case is that you want to represent yourself, but I don't think you have the understanding of what the legal implications are here in this . . . ." Mother interrupted, reiterating that she wanted to represent herself and stating that she had already served a legally binding contract on the Agency, and she planned on taking them to arbitration and to the Supreme Court if she had to.

The court continued that, at that point, it could not make a determination that Ms. Pendergast had "failed in any way in regards to this case." Mother argued that Ms. Pendergast had not helped her or contacted her "the whole time" except for "a couple of days before court," and that she was on vacation, so mother asked her partner to help her challenge jurisdiction and he told her they had to go through this hearing first. Mother also complained that counsel had disclosed confidential tactical information in court. Ms. Pendergast explained that mother wanted to challenge the jurisdiction of the juvenile court and have the matter transferred to federal court, but she felt it was inappropriate to give mother advice while her request for a new attorney was pending. The court told mother that the California superior court had exclusive jurisdiction in this matter and mother countered: "Well, once I challenge jurisdiction, then it has to go before a jury; otherwise, it has to be dismissed or null or void, you know what I'm saying?" Mother claimed to have all the paperwork ready to submit and stated she would give out copies to everyone.

6

The court urged mother to submit the paperwork with respect to both her jurisdictional challenge and her "contract" with the Agency. The court concluded mother was not making a *Marsden* motion so it would not sever her relationship with her attorney. It denied her request for sui juris, and mother strongly objected. The following colloquy occurred:

"**[MOTHER]:** I am not requesting. I am demanding that I get my rights. That is my right as a US national to have representation for my own self. I don't want an attorney. I want to represent myself.

"**THE COURT:** In order for the Court to grant you the right to represent yourself the Court has to be satisfied that you are able—you have to realize that you have to be —when you represent yourself you have to conduct yourself—

"**[MOTHER]:** I am not incompetent.

"**THE COURT:** I am not saying you are. Let me explain to you. Will you please just listen. You have to be able to act in the manner of an attorney and comply with the laws the way an attorney would have to comply with the laws and—

"**[MOTHER]:** So do you.

"**THE COURT:** That is what I am doing.

"**[MOTHER]:** And so do you.

"**THE COURT:** That is why I am explaining it to you. All right.

"**[MOTHER]:** No. You just denied my request. You can't deny my rights. You cannot deny my rights."

Concluding that it was "not getting anywhere," the court continued the matter to October 15, 2021, for mother to present the paperwork she had discussed and to make a decision on her self-representation. While the court was continuing the matter, it referred to mother as Ms. C. Mother objected,

stating: "You are using a title that I am not. I am not under the title of 'Ms.' I am not under your guy's contract. I do not want to be part of your contract. I don't understand your contract. Please do not address me as 'Ms.' My name is [C.C.]" Mother then asked for clarification as to whether she could ask her attorney any information, and the court explained it had not relieved Ms. Pendergast, and she was available if mother wanted to speak with her.

The hearing continued on October 15, 2021. Mother again stated that she did not want an attorney because she wanted to be sui juris and represent herself. The court again tried to explain that if mother represented herself, she would have to comply with all the "rules and regulations" of an attorney. When asked if she understood, mother replied: "That is not how it goes. I am going to be—I will be as a natural woman . . . ." The juvenile court tried to clarify: "[T]he Court has an obligation if you are going to represent yourself as a natural woman that I would then be relieving Ms. Pendergast as your attorney. You would then have to conduct the proceedings, the court proceedings here, in the same manner as an attorney would, and you would be held to the same standard, and the question is whether then you would be able to do that." After mother responded that she did not want to try to be an attorney, she just wanted to be "a natural person to think for herself," the court declined to relieve Ms. Pendergast. However, it stated it was doing so under *Marsden*, that a request from mother to represent herself would be under "different criteria of decision," and that it was "not sure" that mother was able to represent herself. The court then continued the contested six-month review to November 15, 2021. This timely appeal followed.

## II. DISCUSSION

### A. *Denial of Mother's* **Marsden** *Motion*

Mother claims on appeal that the juvenile court erred in denying her *Marsden* motion. "In a criminal case, when a defendant requests substitute appointed counsel, the trial court must permit the defendant to explain the specific reasons why the defendant believes current appointed counsel is not adequately representing [him or her]." (*In re V.V.* (2010) 188 Cal.App.4th 392, 398, citing *Marsden, supra,* 2 Cal.3d at pp. 123–124.) "Juvenile courts, relying on the *Marsden* model, have permitted the parents, who have a statutory and a due process right to competent counsel, to air their complaints about appointed counsel and request new counsel be appointed." (*V.V.,* at p. 398, citing § 317.5 and *In re James S.* (1991) 227 Cal.App.3d 930, 935, fn. 13; see also *In re Z.N.* (2009) 181 Cal.App.4th 282, 289 (*Z.N.*) [*Marsden* principles apply by analogy to dependency proceedings].)

However, a client's claims of a lack of trust, an inability to get along with a lawyer, or tactical disagreements are insufficient to prevail on a motion to discharge appointed counsel. (*In re M.P.* (2013) 217 Cal.App.4th 441, 458 (*M.P.*); see also *In re Samuel A.* (2021) 69 Cal.App.5th 67, 84, fn. 11 [" ' "[I]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law" ' "].) Rather, a defendant is entitled to relief only if "the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. Substitution of counsel lies

9

within the court's discretion. The court does not abuse its discretion in denying the motion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." (*People v. Carter* (2010) 182 Cal.App.4th 522, 527c, quoting *People v. Smith* (2003) 30 Cal.4th 581, 604; accord, *Z.N.*, *supra*, 181 Cal.App.4th at p. 294.)

In their briefing, the parties disagree about whether mother and her attorney had become so "embroiled in such an irreconcilable conflict," that counsel could not fulfill her duties. (See *Z.N.*, *supra*, 181 Cal.App.4th at p. 294.)[4] But a more fundamental problem exists. As our detailed recitation of the facts makes clear, ultimately, mother was *not* seeking substitute counsel, she wanted to represent herself. Under such circumstances, despite the terminology used by counsel and mother's initial statement that she wanted to change her lawyer, the juvenile court was not confronted with a *Marsden* motion but rather by mother's request to represent herself. ("I don't want a new attorney, I want to be sui juris.")

We discuss mother's desire to represent herself below. As for *Marsden*, even were we to apply that framework, there was no evidence that counsel's representation was inadequate. While given every opportunity to air her grievances, mother's only complaints were that Ms. Pendergast had failed to contact her except in the few days before court, that she went on vacation,

---

[4] In addition to the justification for the request, reviewing courts generally assess the timeliness of the request and the adequacy of the trial court's inquiry into the request. (See, e.g., *Z.N.*, *supra*, 181 Cal.App.4th at p. 294.) Here, the parties do not dispute that mother's request was timely, and mother does not contend the juvenile court failed to adequately inquire into her reasons for requesting substitution of counsel. We therefore need not address these factors.

that her office thought it was improper to discuss transferring this juvenile matter to federal court while the *Marsden* motion was pending, and that mother's confidential plan to challenge the juvenile court's jurisdiction was disclosed during the closed hearing. The court concluded it could not make a determination that Ms. Pendergast had "failed in any way in regards to this case," and we agree. (See *M.P.*, *supra*, 217 Cal.App.4th at p. 458 [claims of a lack of trust, an inability to get along with a lawyer, or tactical disagreements are insufficient to prevail on a motion to discharge appointed counsel].) Indeed, it is evident that the relationship with mother and Ms. Pendergast was not irreconcilable, as mother expressly asked if she could resume seeking information from Ms. Pendergast after the September hearing, and the court clarified that mother was free to speak with her appointed counsel. In short, if viewed through a *Marsden* lens, the court did not abuse its discretion.

## B.    *Refusal to Allow Mother to Represent Herself*

Mother next contends that the juvenile court improperly failed to rule on her request to represent herself. She asserts that remand for further proceedings on the issue is required because, had the court directly addressed her request, it would have been error to deny it. Specifically, mother sees no basis in the record to deny her request because "she was not overly disruptive, did not unduly delay the proceedings, and could advocate competently on her own behalf." While we agree that, on this record, the court should have resolved mother's self-representation request, we disagree that remand is necessary. Rather, we find any error in the proceedings below harmless.

Section 317, subdivision (b) requires appointment of counsel for an indigent parent or guardian in a juvenile dependency case "unless the court finds that the parent or guardian has made a knowing and intelligent waiver

11

of counsel as provided in this section." A waiver of counsel is valid if the juvenile court has apprised the parent of the dangers and disadvantages of self-representation and the risks and complexities of his or her particular case. (*In re Brian R.* (1991) 2 Cal.App.4th 904, 921; accord *In re A.M.* (2008) 164 Cal.App.4th 914, 923 (*A.M.*).) "Section 317, subdivision (b) has been interpreted to give a parent in a juvenile dependency case a statutory right to self-representation." (*A.M.*, at p. 923, citing *In re Angel W.* (2001) 93 Cal.App.4th 1074, 1083 (*Angel W.*).) Thus, the juvenile court "must respect the right of the parent to represent him- or herself as a matter of individual autonomy and avoid forcing the mentally competent parent to proceed with appointed counsel in the guise of protecting a person who is unskilled in the law and courtroom procedure." (*Angel W.*, at p. 1084.)

However, it bears repeating that the right to self-representation in juvenile dependency proceedings is statutory only. "A parent in a juvenile dependency case does not have a constitutional right to self-representation." (*A.M.*, *supra*, 164 Cal.App.4th at p. 923; *Angel W.*, *supra*, 93 Cal.App.4th at p. 1082.) Thus, there is no requirement for the juvenile court to "engage in a full *Faretta*-type admonition and inquiry" before ruling on a parent's request to discharge appointed counsel and proceed in propria persona. (*Angel W.*, at p. 1084, referring to *Faretta v. California* (1975) 422 U.S. 806.) Moreover, "in dependency proceedings, a parent's statutory rights, including the right to self-representation, must *always* be weighed against the child's right to a prompt resolution of the dependency proceeding. The juvenile court must consider this right in deciding whether to accept a parent's waiver of counsel and request for self-representation. Thus, the juvenile court has discretion to deny the request for self-representation when it is reasonably probable that granting the request would impair the child's right to a prompt resolution of

12

custody status *or* unduly disrupt the proceedings. A parent's disruptive behavior may be sufficient to deny a request for self-representation, but it is not necessary. If it is reasonably probable that granting a parent's request for self-representation will lead to undue delay in the proceedings that would impair the child's right to a prompt resolution of custody, the juvenile court has discretion to deny the request regardless of whether the parent has ever behaved disruptively." (*A.M.*, at pp. 925–926.)

Here, although mother used the terminology "sui juris," she repeatedly stated that she was requesting to represent herself. Indeed, the court recognized as much, concluding at the September 2021 hearing that mother was not making a *Marsden* motion so it would not sever her relationship with her attorney. Further, the court several times began explaining to mother what would be required of her should it relieve Ms. Pendergast and allow mother to represent herself "as a natural woman"—in effect, trying to determine whether mother could appropriately represent herself—but mother repeatedly interrupted or disagreed with the court. In the end, the court denied the *Marsden* motion and continued the hearing to October 2021 for mother to file her papers and "for some understanding, and. . . to explain to you at that time if you want to represent yourself, then we will make that determination then. At this point I need to see those papers."

At the October 15 hearing, mother's attorney stated the case was continued from September based on the fact that [mother] wasn't articulating her reason for the [*Marsden*] "so that's why it is on today." The court asked mother "are you asking to replace your attorney" and mother responded: "Yes." Mother added: "Yes. I want to be sui juris. I don't want an attorney. I do not want any attorney". The juvenile court again attempted to explain that she would have to "function as an attorney" and "would be expected to

13

comply with all the rules and regulations of an attorney and to conduct yourself as an attorney." However, mother responded "That is not how that goes. I am going to be—I will be as a natural woman and natural man. That is how that is. A natural woman really because I am not a man, so natural woman." Ultimately, the juvenile court expressly denied mother's motion under *Marsden*, noted that a self-representation request would involve "different criteria of decision," and stated that it was "not sure" that mother was able to represent herself. Perhaps the juvenile court thought mother and/or her attorney would re-raise mother's self-representation in open court. However, that did not happen, and neither the court nor mother mentioned the issue further. Instead, the juvenile court continued the case for father's *Marsden* motion and set trial on November 15, 2021 for the contested six-month review hearing. We conclude that, on this record, mother's self-representation request was before the juvenile court, and it was error for the court not to address and resolve it.

In determining whether this error requires reversal, we apply the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 to the juvenile court's decision to, in effect, deny mother's request to represent herself. (*A.M.*, *supra*, 164 Cal.App.4th at p. 928.; *Angel W.*, *supra*, 93 Cal.App.4th at p. 1085.) Under that standard, we ascertain whether it appears reasonably probable mother would have obtained a more favorable result if the juvenile court had directly addressed and resolved her request for self-representation. We conclude that it does not.

Rather, had the court actually resolved the matter, we find it highly likely it would have denied mother's request. The court, itself, indicated it was "not sure" that mother was able to represent herself. Based upon the record before us, we conclude that it is not reasonably probable the court

14

would have allowed mother to represent herself, both because it would likely have caused undue disruption of the proceedings and because it would likely lead to undue delay that would impair L.A.'s right to a prompt resolution of custody.

Indeed, it was difficult for mother to proceed even in the short, closed hearings in a coherent fashion or to respond to the court's questions. When the court repeatedly asked her to explain what she meant by "sui juris," she stated that attorneys cannot represent a man or a woman, they can only represent a child or somebody that is incompetent or a corporation or entity. Mother repeatedly stated she did not want to be represented as a corporation or an entity or as persona or an incompetent person. Mother's conduct was disruptive in the sense that her statements to the court were circular and repetitive, failed to respond to the court's questions and indicated her misunderstanding and misapplication of legal principles, which made it difficult to proceed through even a straightforward hearing.

It is also evident that allowing mother to represent herself would lead to undue delay in the proceedings that would impair the child's right to a prompt resolution of custody. Mother stated that once she "challenge[d] jurisdiction, then it has to go before a jury." Despite the court's explanation that the superior court had exclusive jurisdiction, mother continued to raise her jurisdictional issues. Further, although mother stated she had paperwork to submit to the court, alluding to a contract, and the court continued the hearing for a month so that mother could provide it with that paperwork, there is no indication that she ever did so. (Compare *Angel W.*, *supra*, 93 Cal.App.4th at p. 1085 [describing the mother seeking self-representation as "respectful and cooperative"].)

15

In addition, the contested six-month review—at which the Agency was recommending termination of reunification services and referral of L.A. for permanency planning—was only a month away. And the November 2021 date was already only 6 weeks from the 12-month mark in the case, even though only six months of reunification services are generally authorized for young children like L.A. (§ 361.5, subd. (a)(1)(B).) Under all of these circumstances, it is reasonably probable that granting mother's request for self-representation would have led to undue delay in the proceedings, impairing L.A.'s right to a prompt resolution of custody. (See *A.M.*, *supra*, 164 Cal.App.4th at pp. 925–926; compare *id.* at pp. 927–928 [ample evidence that the father requesting self-representation would cause significant delay where the father resisted compliance with court orders, made lengthy statements that frequently digressed into irrelevant matters, and believed he would need a year to prepare the case].) We therefore find any error by the juvenile court in failing to resolve mother's request for self-representation harmless.

## III. DISPOSITION

The judgment is affirmed.

WISS, J.[*]


WE CONCUR:



HUMES, P. J.




BANKE, J.












A163685




---

[*] Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17