Filed 12/29/20  In re Ivy A. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re IVY A., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>P.A.,<br><br>      Defendant and Appellant; | A159724<br><br>(Contra Costa County Super. Ct. No. J1800268) |

This is the third appeal by Paul A. (Father) in this dependency regarding daughter Ivy A.  This time, Father challenges the juvenile court's order terminating his parental rights following a Welfare and Institutions Code section 366.26 hearing.[1]  He contends the court's renewed appointment of a guardian ad litem for him was an abuse of discretion.  He also argues there was no substantial evidence to support the court's finding that Ivy is adoptable.  We reject both contentions and affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

## BACKGROUND

Ivy, born in February 2018, was removed from her home in March 2018 and declared a dependent of the juvenile court in July 2018. A detailed discussion of the facts relating to her dependency are set forth in our prior two unpublished opinions. In *In re Ivy A.* (June 11, 2019, A154918) [nonpub. opn.] (*Ivy A. I*) we affirmed the juvenile court's jurisdictional findings and its appointment of a guardian ad litem for Father based on substantial evidence of his mental incompetence and inability to assist counsel. (*Ibid.*) Months later, in *In re Ivy A.* (Nov. 11, 2019, A156604) [nonpub. opn.] (*Ivy A. II*), we concluded it was harmless error when the court relieved Father's court-appointed counsel and that substantial evidence supported the court's finding that Father was provided reasonable reunification services. (*Ibid.*) We affirmed the court's order setting the section 366.26 hearing. (*Ibid.*) This appeal challenges the court's order following the section 366.26 hearing, so we discuss only the facts relevant to that proceeding.

The section 366.26 hearing was originally scheduled for June 2019 but was continued so that Ivy's parents, who did not appear, could be properly noticed. At the time, Father did not have an attorney and his guardian ad litem had not had any contact with him.

In October 2019, when the parties reconvened for the section 366.26 hearing after both parents were provided notice, they again did not appear. In discussing whether to proceed, Father's guardian ad litem asked to be relieved and requested the court to appoint Father counsel. The court declined to relieve the guardian ad litem because there had been no apparent change in Father's circumstances, but set a date for appointment of new counsel for Father and continued the section 366.26 hearing. Ivy's attorney asked the court to suspend visits for both of Ivy's parents pending the

2

rescheduled hearing. Based on reports prepared by Contra Costa County Children and Family Services (the Department), the court found that visits were harmful to Ivy and granted the request.

At the hearing two weeks later, Father's new counsel requested and was provided another continuance of the section 366.26 hearing.

The section 366.26 hearing took place on December 19, 2019 with Father present represented by counsel and with his guardian ad litem.

At the outset of the hearing, Father's attorney requested the court reconsider the guardian ad litem appointment. Father no longer believed he needed a guardian ad litem nor did he want an attorney. Father's guardian ad litem joined his request. The court conducted a new guardian ad litem evaluation.

During the in camera proceeding, the court asked Father to explain his understanding of the purpose for the day's hearing, and Father responded it was to terminate parental rights. Asked about the standards that would guide the court to make such a decision, Father explained that he would have to prove the court had no jurisdiction to take his child "because statutes, codes, and regulations are for government authorities only, not human/Creators, in accordance with God's law. And all codes, rules, and regulations are unconstitutional and lack due process." Father supported this principle with *Rodrigues v. Donovan* (1985) 769 F.2d 1344 (*Rodrigues*). He further explained: " 'For the record, that would mean that statutes and codes that the state and agency is moving this court with under [*sic*] are unconstitutional and lacking due process, and they are repugnant to the U[.]S[.] Constitution and are null and void as brought out in the case law of *Marbury v. Madison . . . .* ' " Father demanded the case be dismissed for lack of personal jurisdiction based on the unconstitutionality of the proceeding.

3

He urged the court to " 'not shy away from upholding the U[.]S[.] Constitutional supremacy by upholding [his] constitutional rights in the face of illegal activities of the state agency.' " Earlier in the day, without telling his attorney, Father filed a document with the court that made these same points, and it was made an exhibit to the hearing.

To ensure it understood Father's position, the court clarified with Father that he was arguing the court had no authority to apply the laws against him. Father pointed out he was a "a California national . . . not a citizen" and responded, "Everything is under the Supreme Court, the rules. [¶] And then also, too, I broke it down with, you know, the acts and the reasons where they think they have the authority to take my child, but they don't." The court then asked Father if he understood his right to appeal from a decision to terminate his parental rights. Father said he did, and explained that he would need to fill out a paper for an appeal and submit it to the court.

The court made its ruling from the bench as follows: "I do find by a preponderance of the evidence that [Father] is not able to understand the nature of this particular proceeding and is not able to assist his counsel in the conduct of his defense in a rational manner, and, therefore, I'm going to retain [the guardian ad litem for Father]." The court went on to conduct the section 366.26 hearing.

The section 366.26 report, which had been prepared for the original June 2019 hearing, was updated in October and again in December for the hearing. It provided the following information.

Ivy had been living in a licensed home since February 2019. When she first arrived there, she displayed a variety of concerning behaviors, including aggression around meal time, head banging, and biting others. An assessment by an infant mental health specialist reported that such

4

behaviors were normal following an abrupt change in placement and diagnosed Ivy with adjustment disorder. Eventually, Ivy began working with two behavioral therapists.

Even with her adjustment disorder, the mental health specialist had no concerns about Ivy's treatment or care in her current placement. By June 2019, the therapist found Ivy was adjusting and making great progress in the new home. She was no longer biting or being aggressive around mealtime. She sought out her new caregivers and appeared to have developed a bond with them and their son. The social worker observed she was "happy, smiling, and laughing" when with them.

Developmentally, she was on target for her age. However, her caregivers were concerned about Ivy's ability to speak clearly. There were plans for her to work with a speech pathologist.

Father's contacts with Ivy were reviewed at length. Father entered an appearance with the court in May 2018, two months after Ivy's removal. At that point he was granted supervised visits. Over the next six months, he attended 22 of 29 possible visits. He engaged appropriately and lovingly with Ivy and there were no incidents. But he stopped visiting after attending the November 8, 2018 visit, and at the time of the hearing had not seen Ivy for almost 13 months. The social worker reported that her only contact with Father was in August 2019 when he declined to consent to Ivy's caregivers' request to travel out of state with her. Father left the social worker a voicemail stating he was outraged and wanted Ivy back but left no phone number for her to call.

Ivy's mother's visits were similarly inconsistent. The early ones occurred without incident, and her mother was able to address Ivy's needs, and play with her appropriately and affectionately. However, after a May

5

2019 visit, the social worker no longer received responses from Ivy's mother when she attempted to arrange additional visits. Ivy's mother emailed the social worker once to state she had made several attempts to reach out in order to schedule a visit, but Ivy's mother did not respond to the social worker's reply seeking her contact information. Also, Ivy's caregivers reported that after visiting with her mother, Ivy exhibited a regression in behavior, which included inconsolable crying and gagging. Her progress improved over the recent months without parental visits.

Ivy appeared to be adjusting well under the care of her current caregivers. They were nurturing and affectionate towards Ivy. In turn, Ivy was attached to them and sought them out for comfort and affection. The caregivers were committed to adopting Ivy and to providing her a permanent, stable and loving home.

The Department's assessment stated: "Ivy is improving after having a difficult placement change that occurred in February 2019. The current caregivers have been working diligently to provide the necessary support and comfort to [her] given the difficulties and changes in her life. The child has adjusted well in her placement with the current caregivers. The child has developed a relationship with the caregivers and their son. . . . The family has welcomed Ivy into their home. Their son runs around proudly talking about his little sister. The prospective adoptive parents have been providing the child with a very nurturing, stable and loving home. The child is thriving from such devotion, care, and stability."

The Department had an approved home study on file for the caregivers. They had expressed an interest in adopting Ivy, and there were no impediments to approving their home for adoption. The Department described Ivy as both generally adoptable and "specifically adoptable to the

6

family." In the Department's view, "Ivy [did] not have a significant parent/child relationship that would outweigh the benefits of legal permanency for her." Since she was in a concurrent foster home that was willing and able to adopt her, the Department recommended parental rights be terminated and adoption be Ivy's permanent plan.

Father testified in the hearing. He objected to the entire proceeding and to termination of his parental rights. He explained, " The reason why I object is because all codes, rules, and regulations are for the government authority only, not human/Creators in accordance with God's laws. All codes, rules, and regulations are unconstitutional and lacking due process." Father believed he had a bond with his daughter, even though he had not seen her for some time. Father described his last visit with Ivy. They played and made up characters with her dolls. He placed her on top of his shoulders, grabbed her arms, and pretended to be an airplane. She laughed and giggled, and he told her how much he loved and cared for her, and how he looked forward to having her home. Ivy showed no distress during his visits and was very happy.

Father said he last visited "[r]oughly three months ago, four months ago." He and Ivy's mother both requested ongoing visits but he "never [got] a phone call back." The social worker refused to return his phone calls or emails. But he could not remember the name of the social worker he called. According to Father, the Department terminated his visits with Ivy because he missed one visit.

He explained the court should not terminate his parental rights "[b]ecause I'm a very loving Father who had two other children that nothing ever happened to them. And I don't understand why I'm in the situation I'm in right now, seeing—what did I do? Exist?" Father reiterated his belief that

7

the juvenile court lacked jurisdiction and could not "move forward." He went on: "Because, once again, I'm a living father who has spent countless hours and hours researching legalese that I know nothing about to save my child from what I feel are kidnappers. [¶] I feel that—I don't understand how any of you sleep at night. I don't. Because you're taking a child from somebody who did nothing wrong and saying that the mother who is legally prescribed methadone from the state of California and you took a child because of that. I don't know how you sleep." When he was stepping down from the witness stand, Father commented, "Like I said . . . there's a jurisdictional challenge. I'm going to go ahead and continue to speak whether you like it or not. And this Court can't move forward . . . . [¶] . . . [¶] You can't prove you have jurisdiction over me, nor can this court."

The Department social worker testified. She agreed that the visitation reports showed positive interactions between father and daughter and that Father was able to meet Ivy's needs during those visits. The social worker received an email from Father, and a voicemail which she could not return because he did not leave his phone number. But Father did not request a visit in either communication. The social worker acknowledged that the guardian ad litem appointment was a factor in her recommendation to terminate parental rights because it reflected that Father had a diminished mental capacity. Even so, Ivy's best interests were the driving factor.

Father was recalled to testify in response to the social worker's testimony. He said it was incorrect that he did not ask for visits. He explained that visits ended because once he did not show up and a caseworker, whose name he could not recall, texted him that he would not be allowed to see Ivy anymore. He also disputed that his last visit was in November 2018.

8

The court also allowed Father to again state why he objected to termination of his parental rights. Father reiterated his earlier points: "Well, I would object because I have a jurisdictional challenge in another court that you can't terminate my parental rights right now; that, actually, this whole court comes to a stop because of the fact that when a jurisdiction challenge has been made, the Court cannot move forward. That's why I believe that you can't terminate my rights today. [¶] And another reason why you shouldn't is because I actually love my daughter and so does the mother. And you guys are robbing us of something that you have no right to whatsoever. [¶] So shake your head all you want, but, you know, it's all I can say. What would you do if you were put in this situation? Would you just sit there and let people mow over you and take everything from you." As he stepped down, he added, "[Y]ou guys lose all of your immunity once you decided not to follow the Constitution. Even you, Judge. I hope you're aware of that. I'm aware of that.[¶] . . . [¶] We will be seeing each other again. Trust and believe, whether you terminate my rights or not—[¶] I'm going to go ahead and leave. This doesn't mean shit to me. You are not even a judge. You're an administrator, okay. So you have no rights to do anything to me, actually. You know this. And that's the reason why you shut me down. [¶] And this bitch right here, same thing . . . [¶] . . . [¶] I have nothing but contempt for this court." Father left the courtroom. The court was compelled to continue the hearing.

The section 366.26 hearing was reconvened on January 9, 2020. Father, accompanied by another man, entered the courtroom before the hearing started. They were asked to leave the courtroom because they were early, but declined. Father then served county counsel with documents. After being asked to leave several more times, they did.

9

Father did not return to the courtroom and was not present when the matter was called. So, his counsel requested a continuance, which the court denied.

Before issuing its ruling on the section 366.26 petition, the court noted that Father's challenge to the court's jurisdiction at the prior hearing "just reaffirmed . . . that [he was] in fact incapable of rationally assisting in his defense." The court summarized Father's behavior before the court, including his interruptions with jurisdictional objections, his abrupt departure from the courtroom before the end of the hearing, and his refusal to leave the courtroom earlier that day so that he could serve county counsel with documents. The court described Father's behavior as "irrational, accusatory, and somewhat threatening." Thus, the court continued to believe Father required a guardian ad litem.

The court then ruled on the merits of the section 366.26 petition. The court found that the parents had "little or no meaningful relationship with Ivy." The court had no doubt about their love for Ivy or that they were generally appropriate and loving during their visits. But "they presently ha[d] no bond that [came] anywhere near the benefits that Ivy [could] attain by being adopted by her caregivers." The court found by clear and convincing evidence that the continuation of parental rights would be detrimental to Ivy and that it would also be detrimental to return her to her parents' custody.

The court further found that the prospective adoptive parents had "a loving, supporting, nurturing, and healthy relationship with Ivy" and that Ivy had developed a strong bond with them and their son. The prospective adoptive parents had had Ivy almost half her life, were committed to adopting her, and their home had been approved for adoption. The court found Ivy was generally and specifically adoptable, and there was clear and

10

convincing evidence that Ivy would be adopted. Accordingly, the court terminated parental rights and made adoption Ivy's permanent plan. Father appeals.

## DISCUSSION

### A. Ongoing Guardian Ad Litem Appointment

Father argues the court's findings and order continuing his guardian ad litem must be reversed. Not so.

As we stated in *Ivy A. I*: " 'In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court.' " (*Ivy A. I, supra,* A154918, quoting *In re James F.* (2008) 42 Cal.4th 901, 910 (*James F.*).) " '[T]he primary concern in section 300 cases is whether the parent understands the proceedings and can assist the attorney in protecting the parent's interests in the companionship, custody, control and maintenance of the child.' [Citation.] 'In a dependency proceeding, a juvenile court should appoint a guardian ad litem for a parent if the requirements of either Probate Code section 1801 or Penal Code section 1367 are satisfied.' " (*In re M.P.* (2013) 217 Cal.App.4th 441, 453 (*M.P.*).) Penal Code section 1367 provides that a person is incompetent if he or she "is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367.) Probate Code section 1801 allows for an appointment when a person is "unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter" or is "substantially unable to manage his or her own financial resources or resist fraud or undue influence." (Prob. Code, § 1801, subds. (a), (b).) " '[T]he trial court must find by a preponderance of the evidence that the parent comes within the requirements of either section.' " (*M.P., supra*, at p. 453.)

11

"Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing at which the parent has an opportunity to be heard. [Citation.] . . . A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an inquiry sufficient to satisfy itself that the parent is, or is not, competent. [Citation.] If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence." (*James F.*, *supra*, 42 Cal.4th at pp. 910-911.)

Here, the court's decision to retain Father's guardian ad litem appointment was supported by substantial evidence. Many of the same reasons we affirmed the court's initial appointment in *Ivy A. I* remained applicable and valid.

While Father was able to understand aspects of the section 366.26 hearing and that his parental rights were at risk, the bulk of Father's comments during the guardian ad litem hearing focused on irrelevant considerations and demonstrated that he did not understand the proceedings. He persisted in his refusal to recognize the court's jurisdiction. He asserted that as a "human/Creator," he was not subject to state statutes or regulations. He demanded the dependency be dismissed as unconstitutional for lack of the court's jurisdiction. These arguments continued to show Father did not comprehend the basic nature of dependency proceedings.

While he may have exhibited less hostility towards his new attorney appointed for the section 366.26 hearing, there was still substantial evidence for the court's finding that Father was unable to rationally assist counsel in the conduct of his defense. He filed papers without consulting his counsel. In those papers and his arguments to the court, he cited cases as authority for

12

propositions not stated or included in the opinions. For example, he repeatedly cited *Rodrigues*, *supra*, 769 F.2d 1344, for the principle that "[a]ll codes and rules and regulations are for government authorities only, not human/Creators in accordance with God's law" and "[a]ll codes, rules, and regulations are unconstitutional and lack due process." But *Rodrigues* is a workers' compensation case addressing a court's possible lack of jurisdiction because administrative remedies may not have been exhausted. It says nothing of a court's lack of jurisdiction over an individual. (See *id.* at pp. 1347-1348.) Father's demand that the dependency proceeding be dismissed based on such misplaced authority underscores his inability to aid his counsel.

Father also contends the court applied the wrong legal standard when it weighed his guardian ad litem appointment. He says the court's standard did not conform to our holding in *In re Joann E.* (2002) 104 Cal.App.4th 347 for dependency proceedings. That case articulated the standard as focusing on " 'whether the parent understands the nature of the proceedings and can assist the attorney in protecting his/her rights' " and "not whether the individual is difficult to handle as a participant in the process." (*Id.* at p. 359.) Father contends the court improperly imposed a rationality requirement that allowed it to construe his obstinance or difficult behavior as irrational behavior. We disagree. The court properly considered whether Father was able to understand the nature of the dependency and whether Father was able to rationally assist his counsel. In *James F.*, *supra*, 42 Cal.4th 901, the Supreme Court recognized this to be a proper standard for a guardian ad litem appointment. (*Id.* at p. 916 ["In a dependency proceeding, a juvenile court should appoint a guardian ad litem for a parent if the requirements of either Probate Code section 1801 or Penal Code section 1367

13

are satisfied."].) Apart from whatever difficulties Father's behavior may have presented, there was substantial evidence to support the court's conclusion Father neither understood the proceedings nor could he rationally assist his lawyer.

Father also argues that the court's findings and orders regarding the guardian ad litem appointment at the January 2020 hearing were erroneous and must be vacated. But, any statements in the January hearing were made weeks after the court held the in camera hearing and reevaluated whether the appointment was appropriate. The guardian ad litem appointment was proper when made, and as discussed above, was substantially supported by the evidence presented during the in camera proceeding when it was reconsidered. None of the court's comments from the January 2020 hearing undermined or compromised the validity of the appointment.

## B. Adoptability Findings

Father also argues that the juvenile court's finding that Ivy was both generally and specifically adoptable was unsupported by substantial evidence. Again, we disagree.

"A child who cannot be returned to his or her parent must be placed for adoption, in legal guardianship, or in long-term foster care. [Citation.] 'Adoption, where possible, is the permanent plan preferred by the Legislature.' " (*In re Jose C.* (2010) 188 Cal.App.4th 147, 157-158 (*Jose C.*).) To select adoption as the permanent plan, the court must find, by clear and convincing evidence, the minor is likely to be adopted within a reasonable time after parental rights are terminated. (§ 366.26, subd. (c)(1); *In re B.D.* (2008) 159 Cal.App.4th 1218, 1231.) " 'The issue of adoptability . . . focuses on the minor, e.g., whether the minor's age, physical condition, and emotional

14

state make it difficult to find a person willing to adopt the minor.' " (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.) " ' "[T]he fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." ' " (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562, italics omitted.) When a child's adoption cannot be predicted with confidence as a result of his or her relatively advanced age, poor physical health, physical disability, or emotional instability, the child is said to be not "generally" adoptable. (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408.) In these circumstances, the child may yet be found likely to be adopted under section 366.26 if a person has been identified who is willing to adopt. Such children are deemed "specifically" adoptable. (*Id.* at p. 1408.) "[W]hen a child is deemed adoptable 'only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.' " (*Jose C.*, *supra*, 188 Cal.App.4th at p. 158.) On appeal of a ruling on adoptability, "we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 915-916.)

There was more than ample evidence that Ivy was both generally and specifically adoptable. Ivy was yet an infant. Nothing about her age undermined confidence in her adoptability. Nor were there any issues with Ivy's physical health or her development. The difficult behaviors she

15

displayed were described by the mental health specialist who assessed Ivy as common for a child whose placement had abruptly changed. Months before the section 366.26 hearing, Ivy stopped biting and exhibiting aggressive behavior around mealtimes. By the time of the section 366.26 hearing, she was undergoing therapy to promote verbal expression, reinforce secure attachment, and promote age appropriate behavior. Most importantly, her current caregivers and prospective adoptive parents, with whom Ivy has lived most of her life, wanted to adopt her and were committed to providing her a permanent home. They had an approved home study on file, and there were no legal impediments to their adopting her. Substantial evidence supported the trial court's adoptability findings.

## DISPOSITION

The orders are affirmed.

_____

Siggins, P.J.

WE CONCUR:

_____

Petrou, J.

_____

Jackson, J.

*In re Ivy A.*, A159724