Filed 9/21/21

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION SEVEN

| | |
|---|---|
| In re SAMUEL A., a Person Coming Under the Juvenile Court Law. | B306103<br><br>(Los Angeles County Super. Ct. No. 19CCJP00325A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>PATRICIA A.,<br><br>      Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge. Reversed and remanded with directions.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Amir Pichvai for Plaintiff and Respondent.

———————————————

The appointment of a guardian ad litem for a parent in a dependency proceeding radically changes the parent's role, transferring direction and control of the litigation from the parent to the guardian ad litem. While necessary to protect the rights of an incompetent parent—an individual incapable of understanding the nature and purpose of the proceeding or unable to assist counsel in a rational manner—appointment of a guardian ad litem is not a tool to restrain a problematic parent, even one who unreasonably interferes with the orderly proceedings of the court or who persistently acts against her own interests or those of her child. Yet that is what occurred here: The juvenile court appointed a guardian ad litem for Patricia A., the mother of five-year-old Samuel A. and unquestionably a difficult party, without any finding, let alone evidence, of her incompetence. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Dependency Petition, Jurisdiction and Disposition*

In June 2018 Patricia arrived at the hospital complaining of a migraine headache. Her blood alcohol level measured .297 mg/dL. Patricia explained to her medical providers she had been sober for 11 years but had recently returned to drinking alcohol socially and to alleviate her migraines. An investigation by the Los Angeles County Department of Children and Family Services (Department) into Patricia's neglect of Samuel, who was in daycare when Patricia checked herself into the hospital, was closed as inconclusive.

On January 3, 2019 Patricia returned to the hospital, this time complaining of pain she attributed to chronic diverticulitis. Her blood alcohol level measured .296 mg/dL. Samuel was in daycare. While hospitalized, Patricia exhibited shaking,

2

trembling, hot and cold sweats and increased agitation, which her medical providers attributed to severe alcohol withdrawal. Patricia left the hospital prior to receiving medical clearance for discharge.

On January 16, 2019 the Department filed a petition pursuant to Welfare and Institutions Code section 300, subdivision (b)(1),[1] alleging Patricia had a long and unresolved history of alcohol abuse that made her unable to provide regular care for Samuel. Following a hearing, Samuel was detained from Patricia and placed under the temporary supervision of the Department. Two weeks later the Department filed an amended section 300 petition, adding a second allegation under subdivision (b)(1) that Patricia suffered from severe and untreated anxiety and depression, which also made her unable to provide regular care for Samuel.

According to the evidence presented at the March 20, 2019 jurisdiction hearing, Patricia had a long (more than two-decade) history of alcohol abuse. She had been sober for a time, including during her pregnancy with Samuel, but had begun consuming alcohol again to treat pain and anxiety. The Department provided evidence Patricia had been verbally abusive to, and threatened, nearly everyone in her orbit, including her neighbors and landlord, Samuel's babysitters, social workers and visitation monitors. Patricia denied the allegations in the petition, insisting she did not have a problem with alcohol, and, although she may have anxiety, she did not suffer from a mental impairment that jeopardized Samuel's safety.

---

[1] Statutory references are to this code unless otherwise stated.

3

The court sustained both allegations in the amended petition, finding Samuel to be a person described by section 300. Proceeding directly to disposition, the court declared Samuel a dependent child of the juvenile court, removed him from Patricia's custody and ordered monitored visitation for Patricia for a minimum of six hours per week. The court also ordered a variety of other family reunification services. We affirmed the juvenile court's jurisdiction finding based on Patricia's alcohol abuse and its disposition order removing Samuel from Patricia's custody with monitored visitation. We did not address the court's additional jurisdiction finding. (*In re Samuel A.* (Dec. 16, 2019, B296535) [nonpub. opn.].)

2. *The Department's and Patricia's Section 388 Petitions and Patricia's Court-ordered Psychiatric Evaluation*

On April 29, 2019 Patricia filed a section 388 petition seeking return of Samuel to her custody or, alternatively, liberalized visitation, including unmonitored and overnight visits. The Department filed its own section 388 petition the same day requesting, among other things, a court-ordered Evidence Code section 730 psychiatric evaluation and an order prohibiting Patricia from contacting Samuel's foster parent or coming within a certain distance of the foster parent's home. According to the Department, Patricia's harassment of Samuel's foster parent had already resulted in Samuel's removal from one placement after the foster parent told the Department she feared for her safety, and his current foster parent had expressed similar concerns.

Following an extended hearing on both petitions, the court denied Patricia's section 388 petition, ruling she had not carried her burden to show a substantial change of circumstances since the March 2019 jurisdiction/disposition hearing. The court

4

granted the Department's request to order an Evidence Code section 730 evaluation for Patricia. Patricia's appeal from the order denying her section 388 request for liberalized visitation was dismissed after a subsequent visitation order mooted the appeal. (See *In re Samuel A.* (Feb. 18, 2020, B299022) [nonpub. opn.].)

On August 28, 2019, prior to the six-month review hearing (§ 366.21, subd. (e)), Patricia filed another section 388 petition seeking, pursuant to section 390,[2] to set aside the court's jurisdiction findings and dismiss the amended section 300 petition in the interests of justice. In support of her petition Patricia relied primarily on the July 30, 2019 psychiatric evaluation prepared by Dr. Suzanne M. Dupée, pursuant to Evidence Code section 730, which Patricia attached to her petition as an exhibit. Based on Dr. Dupée's July 2019 interview with Patricia, Patricia's responses on the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and Dr. Dupée's telephone conversation with Dr. Nadine Winocur, Patricia's treating psychologist, Dr. Dupée opined to "a reasonable degree of medical certainty that [Patricia] does not suffer from any major mental illness that impairs her ability to parent her child." Although Dr. Dupée acknowledged Patricia's MMPI-2 results reflected "an extreme attempt" to "present herself as being free of

---

[2] Section 390 provides, "A judge of the juvenile court in which a petition was filed, at any time before the minor reaches the age of 21 years, may dismiss the petition or may set aside the findings and dismiss the petition if the court finds that the interests of justice and the welfare of the minor require the dismissal, and that the parent or guardian of the minor is not in need of treatment or rehabilitation."

psychological problems in order to influence the outcome" of the evaluation, preventing the examiner from interpreting the results in "a straightforward manner," Dr. Dupée nonetheless concluded, based on her overall evaluation of Patricia and telephone consultation with Dr. Winocur, that Patricia's anxiety and anger management difficulties were a "direct result of the dependency proceeding" and not any underlying mental illness.

In its opposition to Patricia's petition, the Department highlighted deficiencies in Dr. Dupée's and Dr. Winocur's reports, observing, in part, that both of them had based their conclusions on Patricia's representations without speaking with any of the Department's social workers.

On September 4, 2019 the court informed the parties of its concerns about the lack of specific findings and test results in Dr. Dupée's report. The court ordered the Department to obtain the psychometric testing data by the next scheduled hearing on September 10, 2019, at which time the court would address both a pending request by Patricia to dismiss her appointed counsel and Patricia's section 388 petition to set aside the jurisdiction findings and dismiss the amended petition.

On September 10, 2019, following a *Marsden* hearing,[3] the court denied Patricia's request to dismiss her appointed counsel

---

[3]     *People v. Marsden* (1970) 2 Cal.3d 118 addresses the circumstances under which a criminal defendant has a right to have his or her appointed counsel replaced and the procedures to be used by the trial court in determining whether those circumstances exist. Because parents have a statutory and due process right to competent counsel in dependency proceedings, a comparable mechanism for challenging the adequacy of their representation by appointed counsel has been recognized by the courts. (See *In re M.P.* (2013) 217 Cal.App.4th 441, 455

but granted her counsel's request to withdraw from the case. The court appointed new counsel, Patricia's fourth attorney in less than eight months. The court then granted Patricia's new counsel time to review the section 388 petition and the psychometric test results supporting Dr. Dupée's evaluation.

On September 12, 2019 the Department filed a walk-on request for issuance of a restraining order to protect a social worker, Samuel's foster parent and Samuel from Patricia. The Department informed the court that, after the last court hearing, Patricia had gone to the home of Samuel's foster parent despite repeated warnings to stay away and her assurances to the court at the prior hearing that she would follow that directive. According to the Department, Patricia also called the child abuse hotline and falsely accused the foster parent of following her in his car and driving recklessly with Samuel in the car. The Department stated Patricia was becoming increasingly erratic and dangerous. Prior to a court hearing in late August 2019, the Department reported, Patricia violently threw documents at a person, resulting in "numerous bailiffs [taking] more than two hours to subdue [Patricia]." A sheriff's deputy at the time noticed Patricia smelled of alcohol. In addition, the Department reported Patricia had exhibited volatile behavior toward the social worker during a monitored visit with Samuel at the Department's offices on September 4, 2019, screaming the social worker was a criminal and a child abuser. After Patricia was

---

["'[j]uvenile courts, relying on the *Marsden* model, have permitted the parents, who have a statutory and a due process right to competent counsel, to air their complaints about appointed counsel and request new counsel be appointed'"]; *In re Z.N.* (2009) 181 Cal.App.4th 282, 289 [*Marsden* principles apply in dependency proceedings].)

unable to calm down and the social worker asked her to leave, Patricia threatened the social worker, telling her "I know where you live." The social worker smelled alcohol on Patricia's breath.

The Department also asked to include Samuel in the scope of the restraining order, asserting Patricia's "unpredictable and violent conduct creates a substantial risk of detriment" to Samuel. Following a recess, the court stated it was issuing a temporary restraining order "on its own motion" until midnight October 3, 2019. The court ordered a mental health evaluation for Samuel, carved out an exception from the temporary restraining order to permit Patricia to have telephonic visitation with Samuel and set a further hearing on the restraining order for October 3, 2019.

At the October 3, 2019 hearing Patricia's counsel requested the court grant the section 388 petition or schedule a hearing on the merits; the Department urged the court to deny the petition as procedurally improper and untimely; and Samuel's counsel stated she had no objection to setting the petition for hearing on the same day as the upcoming six-month review hearing, as several of the issues would overlap. Accepting the Department's argument the section 388 petition was procedurally improper and an untimely new trial motion under Code of Civil Procedure section 659, the court summarily denied the petition without deciding whether Patricia had made a prima facie showing under section 388 sufficient to warrant a hearing on the merits.

Patricia appealed from the summary denial of her section 388 petition. On September 18, 2020 we reversed the court's order summarily denying Patricia's section 388 petition, explaining the juvenile court had erred in construing the section 388 petition as an untimely new trial motion. (*In re*

*Samuel A.* (2020) 55 Cal.App.5th 1, 8-9.) We ordered the juvenile court on remand to consider whether Patricia had made a prima facie showing sufficient to justify a hearing on her section 388 petition. (*Id.* at p. 9.)

    3. *Summary of Proceedings Leading to the Appointment of a Guardian ad Litem for Patricia*

    The juvenile court first raised the possibility of appointing a guardian ad litem sua sponte on November 1, 2019, after granting the request of Patricia's fourth counsel in these proceedings to be relieved, necessitating a further continuance of the contested six-month review hearing. On its own motion the court scheduled a hearing for November 6, 2019 pursuant to *In re Sara D.* (2001) 87 Cal.App.4th 661 (a *Sara D.* hearing)[4] to determine whether to appoint a guardian ad litem for Patricia.

    At the *Sara D.* hearing, which began on November 6th and continued to the following day, the court began by asking Christine Milo, Patricia's newly appointed counsel, whether she was having any difficulty communicating with her client. Citing her ethical duty of loyalty to her client, Milo requested the court address its questions on this issue to Patricia directly. Turning to Patricia the court explained its thinking: "[T]his hearing is to decide the appointment of a guardian ad litem to act on your

---

[4]     In *In re Sara D., supra,* 87 Cal.App.4th 661, the court of appeal held that, before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing and provide a parent with an oppourtunity to be heard. (*Id.* at p. 665, 672; see *In re James F.* (2008) 42 Cal.4th 901, 910 [citing *Sara D.* with approval; due process hearing required before appointment of guardian ad litem].) Such a hearing is now commonly referred to as a *Sara D.* hearing. (See *In re A.H.* (2013) 218 Cal.App.4th 337, 342.)

behalf.  Let me explain what that is.  It's where someone would be appointed by the court to interface with your attorney and address the issues that [have arisen].  And the reason it comes up is that I've reached a conclusion that there is some impediment that seems to suggest you lack the capacity to advise and accept direction from counsel, consult rationally, and understand the proceedings. . . .  There is a finite amount of time for you to reunify with your son.  And so much time has been devoted to addressing your issues and not your son['s].  And I'll go through all of that.  And the concern is that when we get to the contest, if, in fact, you are the impediment, you are the reason because of certain deficiencies that prevent you from aiding counsel in properly reunifying, you'll run out of time."

In response to the court's inquiry whether she would consent to the appointment of a guardian ad litem, Patricia adamantly refused, expressing concern about the court's impression of her as the impediment to the proceedings.  Patricia stated, "I don't know how the court got the impression, but I can only guess that it's because my court-appointed attorneys have simply not done their job.  And I'm going to just point out for the purpose of time the most recent court-appointed attorney . . . pretty much told me right away she has 200 cases to deal with at the same time; that she has absolutely no time to read my emails, to go and meet with me, and to go—really go—into this case."  Patricia explained she had helped her counsel with exhibits, obtained numerous recommendation letters on her behalf, and her counsel simply do not want to hear it.  "I clearly see impediments in this case.  But I'm viewing it from my perspective.  And my perspective as a parent is I have to rely on a competent counsel to please help me who has the time to go and

help me." Patricia explained she had repeatedly told her counsel about biased social workers and asked for assistance in removing a particular social worker, but her counsel disregarded her request and failed to respond to numerous emails from Patricia about preparing for the contested six-month review hearing.

The court replied it had initially believed Patricia's conflicts with counsel were due to several unexpected issues in the case that required flexibility on its part. However, over time, "when I look at the full record and I look at how you've conducted yourself, I see that there is, in fact, a more logical explanation, which is, I don't think you understand the proceedings. I don't think you fully grasp how to advise and provide information to counsel and work with them in a productive way; and that you are, in fact, the impediment."

Citing Patricia's positive Evidence Code section 730 report, Milo requested the court not appoint a guardian ad litem and allow Milo the time to consult with her client and address Patricia's concerns. The court agreed not to appoint a guardian ad litem, but told Patricia and Milo it would revisit the issue if Patricia continued not to appreciate the ramifications of her conduct.

On January 2, 2020, four days before the rescheduled January 6, 2020 six-month review hearing, Milo, too, declared a conflict, citing an "irreparable breakdown of the working relationship between counsel and client whereby there are irreconcilable differences between the lawyer and client resulting in an ethical conflict" and requiring termination of the representation. Following an in camera proceeding, first on Patricia's *Marsden* motion (which the court denied) and then on Milo's request to be relieved, the court granted Milo's request on

11

January 6, 2020, appointed new counsel (Frank Ostrov) for Patricia and continued the contested six-month review hearing to February 3, 2020.

On January 22, 2020 Ostrov moved to be relieved as counsel, citing Patricia's hostile behavior and threats to him that made it impossible for him to zealously represent her. The court set a new guardian ad litem hearing for January 24, 2020 and indicated it would address Ostrov's motion then. Following two continuances of that hearing due to Patricia's unannounced absences (Patricia later explained she had been in the emergency room after being injured in an assault and was unable to contact anyone), the hearing to address Ostrov's request and appointment of a guardian ad litem took place on February 3, 2020. Ostrov recited Patricia's statements to him, which he had recorded on his cell phone and played for the court. Among other things, Patricia insulted Ostrov's family and told him she wished that he and his family would be killed. Patricia apologized for her behavior and withdrew her *Marsden* motion.

The court initially denied Ostrov's request to withdraw due to an irreconcilable conflict, then granted it after hearing the recording and Patricia's admission that the recording was accurate. The court described Patricia's behavior on the recording as "menacing" and recalled witnessing her outbursts both inside and outside of the courtroom on other occasions (for which security had been called.) The court appointed new counsel for Patricia, Melineh Hatamian, and continued the six-month review hearing to March 11, 2020. The court ordered the guardian ad litem hearing "taken off calendar and taken into abeyance," based largely on Patricia's assurances she was committed to cooperating with the court and her new counsel.

On March 11, 2020, at the scheduled six-month review hearing, Patricia made a *Marsden* motion to dismiss Hatamian as her appointed counsel. The court denied the request, but granted Hatamian's request to be relieved as counsel due to an irreconcilable conflict with Patricia in the representation. The court appointed new counsel, Sherwin Hosseini Amazan; continued the contested hearing to April 9, 2020, at which time it would conduct a combined six- and 12-month review hearing (§ 366.21, subds. (e), (f)); and stated its intent to continue on March 12, 2020 the guardian ad litem hearing that "began previously."

On March 12, 2020 Amazan informed the court he believed the case and client were simply too much for his solo practice and asked if his experienced colleague, Niti Gupta, who was present at the hearing, could substitute in for him. The court granted the request, appointed Gupta as counsel for Patricia, and rescheduled the combined six- and 12-month review hearings for April 3, 2020.

Proceeding directly to the continuation of the guardian ad litem hearing, the court stated it had initially believed that Patricia simply did not understand or appreciate the nature of the proceedings and for that reason was incapable of understanding and assisting her counsel. However, citing the Evidence Code section 730 evaluation finding no evidence of a DSM-5 recognized condition, the court stated, "[S]o I don't think it comes from mental health incapacity, and I have a feeling she understands these proceedings." Finding Patricia's conduct was a knowing and deliberate effort to obstruct proceedings she believed were not going to be favorable to her, the court appointed a guardian ad litem for her and ordered Patricia to

communicate with her counsel only through her guardian ad litem. Gupta asked the court to stay its appointment order so that she could consult with Patricia and determine if a guardian ad litem was, in fact, necessary. The court agreed and stayed the order but told Gupta it did not want any further delays caused by Patricia's conduct. If Gupta was unable to have meaningful communication with Patricia, Gupta should alert the court; and it would lift the stay of its guardian ad litem order.

In early April 2020, following continuation of the combined six- and 12-month review hearing to May 7, 2020, Gupta filed a stipulated request signed by all counsel to lift the stay of the court's prior order appointing a guardian ad litem for Patricia. In her written request Gupta stated, "Counsel for mother has worked extensively and diligently on this case since appointment and has determined that an appointment of the guardian ad litem is in fact necessary to assist counsel for the mother to adequately, effectively, and competently represent the interests of the mother in the upcoming section 21e/21f proceeding, scheduled for May 7, 2020 at 8:30 am in said Department. [¶] The undersigned has made every reasonable and diligent effort to have an effective and meaningful line of communication and cooperation with the mother without avail thereby making it difficult for counsel to fulfill her professional and ethical obligations." The court lifted the stay of its March 12, 2020 guardian ad litem appointment order.

Patricia filed a timely notice of appeal from the March 12, 2020 and April 20, 2020 orders appointing a guardian ad litem.

14

**DISCUSSION**

1. *Governing Law*

"In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court. [Citations.] The test [for mental competence] is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case." (*In re James F.* (2008) 42 Cal.4th 901, 910.) Stated another way, "[a] person may be found incompetent if the person was either incapable of understanding the nature and purpose of the proceeding *or* unable to assist counsel in a rational manner." (*In re M.P.* (2013) 217 Cal.App.4th 441, 452.)

"Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing at which the parent has an opportunity to be heard. [Citation.] The court or counsel should explain to the parent the purpose of the guardian ad litem and the grounds for believing that the parent is mentally incompetent. [Citation.] If the parent consents to the appointment, the parent's due process rights are satisfied. [Citation.] A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an inquiry sufficient to satisfy itself that the parent is, or is not, competent. [Citation.] If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence." (*In re James F., supra,* 42 Cal.4th at pp. 910-911; accord, *In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1186; *In re Sara D., supra,* 87 Cal.App.4th at pp. 667-668.)

15

The appointment of a guardian ad litem for a parent in a dependency case "is no small matter. The effect of the appointment is to remove control over the litigation from the parent, whose vital rights are at issue, and transfer it to the guardian. Consequently, the appointment must be approached with care and appreciation of its very significant legal effect. 'The court is being asked to dramatically change the parent's role in the proceeding by transferring the direction and control of the litigation from the parent to the guardian ad litem.' . . . Because the 'decisions made can affect the outcome of the dependency proceeding, with a corresponding effect on the parent . . . the parent has a direct and substantial interest in whether a guardian ad litem is appointed.'" (*In re Jessica G.*, *supra*, 93 Cal.App.4th at pp. 1186-1187; accord, *In re Sara D.*, *supra*, 87 Cal.App.4th at p. 668.)

2. *The Court's Appointment of a Guardian ad Litem for Patricia Is Not Supported by Substantial Evidence*

Patricia contends the court erred in appointing a guardian ad litem for her. While acknowledging overwhelming evidence that she was difficult, demanding, and frequently clashed with her appointed counsel, she argues there was no evidence, and indeed, no finding by the juvenile court, that she lacked the capacity either to understand the nature of proceedings or to assist counsel in a rational manner: The July 2019 Evidence Code section 730 evaluation found Patricia did not suffer from an underlying mental health condition; none of Patricia's counsel had suggested the difficulties experienced with her were caused by Patricia's mental incompetence; and even the trial court, which initially believed she lacked the capacity to assist counsel,

16

ultimately appointed the guardian ad litem based on a finding her lack of cooperation was strategic.

The Department responds that Patricia's inability to assist counsel in a rational manner was plain on the face of the record: A multitude of experienced and competent counsel, and in some cases, their entire law firms, moved to be relieved from representing Patricia, citing irreconcilable differences and, at times, a total breakdown in communication with their client. That no attorney was able to represent Patricia for any meaningful length of time, the Department argues, was prima facie evidence of her inability to rationally assist counsel.

Contrary to the Department's contention, Patricia's deliberate failure to cooperate with counsel, without more, does not demonstrate incompetency. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 879 ["[v]oluntary barriers to communication with counsel on the part of a defendant who was able to cooperate [but elected not to] do not demonstrate incompetence" under Penal Code section 1367[5]]; *People v. Mai* (2013) 57 Cal.4th 986, 1034 ["an uncooperative attitude is not, in and of itself, substantial evidence of incompetence"]; *People v. Clark* (2011) 52 Cal.4th 856, 893 ["'the test, in a section 1368 proceeding, is competency to cooperate, not cooperation'"]; *People v. Medine* (1995) 11 Cal.4th

---

[5] Penal Code section 1367 provides a defendant is incompetent for purposes of a criminal trial "if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner"—the same standard used to determine competence for purposes of appointment of a guardian ad litem in dependency proceedings (*In re James F., supra,* 42 Cal.4th at p. 916).

694, 735 ["[d]efendant's cursing and disruptive actions displayed an unwillingness to assist in his defense, but did not necessarily bear on his competence to do so"]; see also *In re James F.*, *supra*, 42 Cal.4th at p. 916 ["[i]n a dependency proceeding, a juvenile court should appoint a guardian ad litem for a parent if the requirements of *either* Probate Code section 1801 [standards for appointment of conservator] *or* Penal Code section 1367 [standards for finding criminal defendant mentally incompetent] are satisfied"].)[6]

The Department's reliance on *In re M.P., supra,* 217 Cal.App.4th 441 to support the court's ruling is misplaced. In that case, a psychological examination found the mother involved in a dependency matter suffered from schizophrenia, paranoid type, with the presence of prominent delusions. The mother's counsel requested the court hold a guardian-ad-litem hearing, advising the court, "[T]he mother . . . and I have run into a conflict, and our understanding of one another. And I do believe that she would benefit from the assistance of a guardian ad litem in terms of making legal decisions and legal strategy." (*Id.* at p. 447.) The attorney explained that the mother did not agree with the appointment of a guardian ad litem and wanted a new attorney. The court held a *Sara D.* hearing. Citing a 2008 psychological assessment that found the mother had "'serious mental health needs'" and "'is not able to . . . understand the difference between facts as the majority of people are experiencing [them] and the way that [she] is experiencing the world around her'" and that it was "'impossible to have a

_____

[6]     The Department does not argue, and there is no evidence, that Patricia meets the standard for appointment of a conservator under Probate Code section 1801.

competent intelligible kind of a legal conversation,'" counsel thought it best if the court appointed a guardian ad litem, who would work with the mother and understand what needed to be done "'to move forward with this case.'" (*Id.* at p. 449.) During the hearing the court questioned the mother. Following responses from the mother that were "meandering, nonresponsive and sometimes unintelligible" (*id.* at p. 450), the court appointed a guardian ad litem for her.

On appeal the mother in *In re M.P.*, *supra*, 217 Cal.App.4th 441 argued the court had simply assumed, without evidence, that mother's mental illness rendered her mentally incompetent to understand the proceedings or assist her counsel in a rational manner. The court of appeal rejected that argument and affirmed the appointment of a guardian ad litem, finding substantial evidence, "[b]ased upon [the court's] exchange with mother and her counsel at the closed [guardian ad litem] hearing," that the mother "could not rationally confer with her counsel about the facts or rationally assist him with the case and she could not rationally give and take advice regarding legal strategy. Mother's responses [at the hearing] indicated that she was still delusional and did not appreciate her own mental health problems that had led to the commencement of the dependency proceeding." (*Id.* at p. 454.)

Here, in stark contrast to *In re M.P.*, none of Patricia's counsel expressed any doubt about Patricia's competence, nor did her responses to the court during the hearing suggest it.[7] In fact,

_____

[7]     Gupta was the only counsel who stated, in her request to lift the stay of the prior court order appointing a guardian ad litem, that the appointment was necessary to allow her to competently represent Patricia at the upcoming six- and

19

citing Patricia's favorable Evidence Code section 730 evaluation, the court expressly found Patricia's clashes with counsel were not the result of any mental health disorder but were deliberate and strategic, designed to frustrate and delay proceedings she believed were going to be unfavorable to her. Yet, notwithstanding a finding that Patricia was not incapable of assisting, but merely unwilling to do so, the court appointed a guardian ad litem for Patricia, reasoning it was the only means available to move the case along and ensure Patricia had the benefit of counsel while she still had some opportunity to reunify with Samuel. However well-intended the court's ruling may have been, a parent's due process right to communicate directly with counsel in proceedings that could culminate in the termination of her parental rights is fundamental.[8] (*In re Sara D.*, *supra*,

---

12-month review hearing. Gupta did not indicate Patricia was unable, rather than unwilling, to cooperate with Gupta. And we do not know any more about the basis for Gupta's request because the court did not hold a further hearing, but simply lifted the stay of its earlier order based on its mistaken finding there existed sufficient grounds for appointment of a guardian ad litem. Gupta's request, unaccompanied by the required due process hearing and an opportunity for Patricia to respond (*In re James F.*, *supra,* 42 Cal.4th at p. 910), neither constitutes substantial evidence to support the court's appointment of a guardian ad litem nor renders the appointment of a guardian ad litem absent a proper hearing harmless. As discussed in section 3, this is not a case such as *James F.* where the parent's incompetence is beyond dispute.

[8] During the pendency of this appeal challenging the appointment of a guardian ad litem, Patricia's parental rights were, in fact, terminated at a hearing at which she was prohibited from communicating directly with counsel purportedly

20

87 Cal.App.4th at p. 669 ["transferring direction and control of the litigation through appointment of a guardian ad litem [for a parent] in a dependency proceeding may jeopardize the parent's interest as much, if not more, than any of the actions taken in the cited custody cases finding a due process violation"]; see also *In re A.R.* (2021) 11 Cal.5th 234, 245 [order terminating parental rights is "widely recognized as ranking 'among the most severe forms of state action'"]; see generally *M.L.B. v. S.L.J.* (1996) 519 U.S. 102, 128.) Patricia's right to actively participate in this dependency proceeding may not be disregarded for the sake of expediency.[9] (See *In re Josiah S.* (2002) 102 Cal.App.4th 403,

representing her. (We take judicial notice of the juvenile court's May 7, 2021 order terminating Patricia's parental rights pursuant to Evidence Code sections 452, subdivision (d), and 459.) That order, as well as all other orders made by the juvenile court while a guardian ad litem was in place, must be vacated.

[9] The Department's reliance on Code of Civil Procedure section 372, subdivision (a), to argue expediency alone is a sufficient basis for the appointment of a guardian ad litem is just wrong. Code of Civil Procedure section 372, subdivision (a), provides in part, "A guardian ad litem may be appointed in any case when it is deemed by the court in which the action or proceeding is prosecuted, or by a judge thereof, expedient to appoint a guardian ad litem to represent the minor, person lacking legal capacity to make decisions, or person for whom a conservator has been appointed . . . ." This statute authorizes appointment of a guardian ad litem only if the requirements for appointment are met for a minor, a person lacking legal capacity to make decisions (that is, a legally incompetent person), or a person in a conservatorship. It does not authorize such a drastic measure for expediency's sake alone. (See generally *In re James F., supra*, 42 Cal.4th at p. 910.)

417-418 ["We understand from our prior review of orders issued in this case that appellant can be more demanding on the system than others. But that does not justify denying her the rights afforded under the law"].)

      3. *The Appointment of a Guardian ad Litem for Patricia Was Not Harmless*

Relying on *In re James F., supra,* 42 Cal.4th 901 and *In re Daniel S.* (2004) 115 Cal.App.4th 903, the Department alternatively argues that any error in appointing a guardian ad litem was harmless beyond a reasonable doubt.[10] In both

---

[10] In *In re James F., supra*, 42 Cal.4th 901 the Supreme Court held appointment of a guardian ad litem in violation of due process was subject to harmless error review (that is, it was not structural error) without specifying whether the question of prejudice should be analyzed under the standard for state law error stated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (a reasonable probability of a more favorable outcome), the more exacting standard for federal constitutional error of *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt), or some intermediate standard of prejudice. (See *James F.*, at p. 911, fn. 1 ["[b]ecause we did not grant review on the appropriate harmless error standard and the parties have not briefed it, we do not address that issue here"].)

While we are inclined to agree with those appellate courts that have found the *Chapman* standard appropriate for the due process violation at issue (see *In re Daniel S., supra,* 115 Cal.App.4th at p. 914 [due process violation in appointing guardian ad litem held harmless "beyond a reasonable doubt"]; *In re Sara D., supra*, 87 Cal.App.4th at p. 674 [due process violation in appointing guardian ad litem reversible error unless harmless beyond reasonable doubt]), we need not resolve that question because the error in appointing a guardian ad litem for

22

*James F.* and *Daniel S.* the juvenile court appointed a guardian ad litem for a parent in dependency proceedings without proper notice to the parent or explanation to the party of the consequences of its order. In both cases the due process deprivation was held harmless because the parent's incompetence was beyond dispute. (See *James F.*, at p. 916; *Daniel S.*, at p. 913.) Those cases have no application here, where, as we have explained, there is no evidence of Patricia's inability to assist counsel due to a mental health disorder or developmental disability.

The Department emphasizes the juvenile court only appointed a guardian ad litem as a last resort, after finding other measures it had utilized to control Patricia's behavior (calling security to prevent in-court outbursts after she was heard shouting and seen throwing things in the hallway outside the courtroom and issuing restraining orders to protect the subjects of her out-of-court threats) insufficient to address Patricia's conflicts with her counsel. Implicit in the Department's assertion of these facts is the question: What is to be done with a parent like Patricia, who engages in demanding, harassing, and even threatening behavior with her counsel, undermining counsel's ability to provide effective representation and interfering with counsel's own personal well-being?

We appreciate the difficulty confronting counsel and the court on the front lines of Patricia's behavior. We also agree with the juvenile court that Patricia has done herself no favors by engaging in conduct that alienated her counsel and, at the very least, delayed reunification efforts. Nonetheless, as Patricia's

_____

a parent without a supportable finding of incompetence is prejudical under any standard.

appellate counsel points out, a large part of the problem was caused by the court's own rulings granting the requests of numerous appointed counsel to be relieved following Patricia's unsuccessful *Marsden* motions.  The court need not have granted permissible withdrawal if the delay caused by replacement of counsel would have prejudiced Patricia in proceedings in which time is of the essence.  (See *Lempert v. Superior Court* (2003) 112 Cal.App.4th 1161, 1173 ["[t]he determination whether to grant or deny an attorney's motion to withdraw as counsel of record lies within the sound discretion of the trial court, having in mind whether such withdrawal might work an injustice in the handling of the case"]; *Mandell v. Superior Court* (1977) 67 Cal.App.3d 1, 4 [court has discretion to deny attorney's request to withdraw when withdrawal would result in an injustice or cause undue delay]; see generally *In re Jesusa V.* (2004) 32 Cal.4th 588, 637 [the Legislature has declared that dependency actions be resolved expeditiously]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 [time is of the essence in dependency proceedings]; *In re Daniel S., supra*, 115 Cal.App.4th at p. 913 [same].)[11]

---

[11] In denying Patricia's *Marsden* motions to replace her appointed counsel, the court implicitly recognized that bad behavior directed to one's own counsel is not grounds for replacement of appointed counsel.  (See, e.g., *People v. Johnson* (2018) 6 Cal.5th 541, 576 ["[A] defendant may not force the substitution of counsel by manufacturing a conflict or a breakdown in the relationship through his own conduct. [Citations.]  Here it was defendant who repeatedly spit on and unilaterally refused to cooperate or even speak with counsel— and who ultimately assaulted counsel in open court.  A defendant cannot take such steps and then rely on that same behavior to assert an irreconcilable conflict with counsel"]; *People v. Michaels*

24

To address Patricia's behavior, Patricia's counsel may find it helpful to impose reasonable and well-defined limitations on communications with Patricia, as Patricia's appointed appellate counsel seems to have successfully done.[12] For instance, to address Patricia's sometimes hundreds of emails a day to counsel,

(2002) 28 Cal.4th 486, 523 ["Defendant cannot simply refuse to cooperate with his appointed attorney and thereby compel the court to remove that attorney. '"[I]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law"'"].) Nevertheless, by repeatedly allowing Patricia's attorneys to withdraw following Patricia's unsuccessful *Marsden* motions, the court may have reinforced Patricia's disruptive conduct.

[12] On June 7, 2021, after completion of briefing in this case, Patricia's appointed appellate counsel filed a request to withdraw as counsel on two new appeals by Patricia from subsequent juvenile court orders for which briefing had not yet begun. Following appellate counsel's consultation with the California Appellate Project, counsel's own recognition that she was best suited for the representation in light of her extended involvement in this case, and Patricia's promise to rein in her demands and refrain from the behavior that had impeded counsel's ability to represent her as well as to maintain her practice and her personal well-being, Patricia's appellate counsel asked this court to stay any ruling on her request to withdraw pending further developments on appeal, "if such need ever arises." We granted that request. (We take judicial notice of this information, which is contained in the records of our court, pursuant to Evidence Code sections 452, subdivision (d) and 459.)

counsel may require that Patricia send no more than a specific number of emails (two or three, for example) in a 24-hour period and state that counsel will respond only once during that same (or some other reasonable) period, with the understanding that these limitations (and Patricia's violation of them) will not be grounds for replacement of counsel, either through a motion by Patricia or by counsel's request to withdraw. To the extent Patricia attempts personally to file documents while represented by counsel, the court should reject those documents for filing without ruling on them.[13] If Patricia's outbursts in the courtroom continue (it appears Patricia has been able to control herself, at least while in the courtroom), the court may take appropriate measures, including, if necessary, having her removed. What the court may not do is appoint a guardian ad litem as a response to a legally competent, albeit exceedingly difficult, parent.[14]

Our holding reversing the guardian ad litem orders will require the juvenile court to vacate all subsequent orders made

---

[13] Following the appointment of a guardian ad litem, Patricia filed section 388 petitions in propria persona, without the assistance of counsel or her guardian ad litem. We take judicial notice of those filings (Evid. Code, §§ 452, subd. (d), 459) and note, without deciding, that the act of filing an appropriate petition for modification might be further evidence that Patricia is capable of understanding the proceedings and assisting her case.

[14] The appointment of the guardian ad litem in a case such as this one would seem to do little to ameliorate the harassment the court found troubling. Such an order merely transfers the intended target of Patricia's behavior from counsel to the guardian ad litem tasked with speaking with her counsel on her behalf.

during proceedings in which Patricia was denied the benefit of communicating directly with her counsel (see *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 535-536 [in light of reversal of court's order denying parent's section 388 petition, the court's subsequent order terminating parental rights must also be vacated]; see generally *California Public Records Research, Inc. v. County of Alameda* (2019) 37 Cal.App.5th 800, 813). We recognize that this will further delay already delayed proceedings. While unfortunate, that is the inevitable consequence of proceeding in a manner that violated Patricia's fundamental rights.

## DISPOSITION

The court's March 12, 2020 order appointing a guardian ad litem for Patricia is reversed. On remand the juvenile court is ordered to vacate its April 20, 2020 order and all subsequent orders in which Patricia was denied the right to directly communicate with her counsel, including the court's orders at the section 366.21, subdivisions (e), (f), hearing and the section 366.26 hearing that resulted in the termination of Patricia's parental rights.

PERLUSS, P. J.

We concur:

SEGAL, J.             FEUER, J.